**UNITED STATES of America, Appellant–Cross–Appellee,**

v.

**Marion T. FRAMPTON, Defendant– Appellee–Cross–Appellant,**

**Latique Johnson, also known as "John", Defendant– Appellee.**

**No. 02–1512(L), 02–1656, 02–1678(XAP).**

United States Court of Appeals, Second Circuit.

Argued: May 21, 2004.

Decided: Sept. 1, 2004.

David M. Grable, Assistant United States Attorney for the Northern District of New York (Glenn T. Suddaby, United States Attorney, William C. Pericak, Assistant United States Attorney, on the brief), Albany, NY, for Appellant–Cross–Appellee.

Andrew D. Greene, Lake Success, NY, for Defendant–Appellee–Cross–Appellant.

Craig P. Schlanger, Syracuse, NY, for Defendant–Appellee.

Before: WINTER, STRAUB, and LAY,* Circuit Judges.

LAY, Circuit Judge.

Marion T. Frampton and Latique Johnson were indicted on several counts stemming from their involvement in the attempted murder of Michael Johnson (a.k.a."Henry"), the leader of a crack cocaine enterprise operating out of a resi-

dence located at 41 Ingalls Avenue, Troy, New York ("41 Ingalls" or the "41 Ingalls enterprise").

## A. The Proceedings Below

On January 30, 2002, a federal grand jury returned a multi-count indictment against Frampton and Johnson, charging them as follows: Frampton and Johnson with using or causing another to use a facility in interstate commerce in the commission of murder-for-hire, and aiding and abetting the same (Count 1: violation of 18 U.S.C. §§ 1958 & 2); Frampton and Johnson with conspiracy to commit murder-for-hire (Count 2: violation of 18 U.S.C. §§ 1958 & 2); Frampton with willfully causing, and Johnson with aiding and abetting, the commission of a violent crime in aid of racketeering (Count 3: violation of 18 U.S.C. §§ 1959 & 2); Frampton only with conspiracy to distribute crack cocaine (Count 4: violation of 21 U.S.C. § 846 and 18 U.S.C. § 2); Johnson only with using, or aiding and abetting the use of, a firearm in connection with a crime of violence (Count 5: violation of 18 U.S.C. §§ 924(c) & 2); Frampton only with using, or willfully causing another to use, a firearm in connection with a crime of violence (Count 6: violation of 18 U.S.C. §§ 924(c) & 2); and Frampton only with transferring a firearm with knowledge that it would be used to commit a crime of violence (Count 7: violation of 18 U.S.C. § 924(h)).[1]

On March 5, 2002, Frampton and Johnson were convicted by a jury in the United States District Court for the Northern District of New York (Frederick J. Scullin,

---

* The Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The Indictment also charged Frampton with knowingly and intentionally possessing a weapon and ammunition after previously having been convicted of a felony (Count 8: violation of 18 U.S.C. §§ 922(g) & 924(a)(2)). Prior to trial, the Government agreed to severance of that charge in contemplation of dismissal in the event that Frampton was convicted on the remaining counts.

Jr., *Chief Judge*) on all counts. Following the verdict, both filed separate motions pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, seeking an acquittal on the basis that the evidence adduced at trial was insufficient to sustain their convictions. In the alternative, Frampton and Johnson also filed motions pursuant to Rule 33 of the Federal Rules of Criminal Procedure, requesting a new trial, again challenging the sufficiency of the evidence.

On July 24, 2002, the district court ruled upon these motions in a Memorandum Decision and Order. The district court granted, on sufficiency of the evidence grounds, Frampton's and Johnson's request for a judgment of acquittal on Counts 1 and 2, as well as Johnson's request for a judgment of acquittal on Counts 3 and 5. The district court denied, however, Frampton's request for either a judgment of acquittal or a new trial on his remaining counts of conviction. The Government appeals the former portion of the district court's order, Frampton cross-appeals the latter.[2]

## B. *The Offense Conduct*

Viewed in the light most favorable to the jury's verdict, the evidence at trial demonstrated the following:

On New Year's Eve 1998, Frampton, together with his friend Reggie Cooley, attended a party in Troy, a city approximately 160 miles north of New York City. Cooley, who sold crack cocaine in the New York City borough of the Bronx, was on the run from local police and was looking to lay low for some time while making his trade elsewhere. Frampton, who was himself a crack cocaine dealer, had fallen on hard times and was in need of additional money. Both believed that the solution to their problems lay in Henry, a friend of Frampton's present at the party.

At some point during the evening, Frampton and Cooley met Henry to discuss their situation. The three reached an agreement whereby Frampton and Cooley were permitted to sell crack cocaine out of 41 Ingalls, although each held radically different views regarding the agreement's extent and duration. To Henry's mind, the problems facing Frampton and Cooley were only temporary in nature, and thus dictated only a temporary arrangement: Frampton and Cooley were permitted to sell crack cocaine out of 41 Ingalls only until they got back on their feet. To Frampton and Cooley, however, Henry had imposed no such limitation, but rather he welcomed them into the 41 Ingalls enterprise as full partners.

Sometime in early January 1999, Henry approached Frampton and Cooley and informed them that "they got their money right," and that it was time for them to leave 41 Ingalls. Although Frampton remained silent, Cooley balked at this suggestion, telling Henry in no uncertain terms that he was not about to walk away from a lucrative crack cocaine enterprise. Both Frampton and Cooley felt that Henry had reneged on their agreement to share the proceeds of the 41 Ingalls enterprise and agreed that a harsh response was appropriate. Frampton and Cooley ultimately plotted a scheme to kill Henry and take control of the 41 Ingalls enterprise. Johnson, Cooley's friend, agreed to act as

---

**2.** By letter submitted to the Court on July 22, 2004, Frampton also raises a Sixth Amendment challenge to his sentence based on the Supreme Court's recent decision in *Blakely v. Washington*, — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (June 24, 2004). In light of our decision in *United States v. Mincey*, 380 F.3d 102, 2004 WL 1794717, at *3 (2d Cir. August 12, 2004), we reject that claim.

the triggerman in exchange for Cooley's promise of an unspecified future "favor."

On January 19, 1999, Johnson and Frampton were picked up in the Bronx by a private car service destined for Troy. During the journey, Frampton used a cellular phone to make several calls to Cooley, who had remained in Troy so as not to arouse Henry's suspicions. At approximately 10 p.m., Frampton and Johnson arrived in Troy, and Frampton guided the driver to a predetermined location to pick up Cooley. Together, and outside the presence of the driver so as to avoid being heard, the three men discussed the details of Henry's killing one final time. Because Johnson had never before seen his intended victim, Cooley agreed to identify Henry by greeting him in a distinctive manner, telling Johnson "when I give him a five, that's him, that's who to shoot."

Frampton, Cooley, and Johnson re-entered the private car. Frampton directed the driver to the apartment at which he was staying, where he retrieved a loaded .380 caliber semi-automatic handgun, which he provided to Johnson. Cooley then proceeded to guide the driver through the streets of Troy in search of Henry. Once Henry was discovered, Cooley instructed the driver to park the car a safe distance away, and Cooley and Johnson exited the vehicle. While Johnson watched from afar, Cooley approached Henry and identified him in the agreed-upon manner. His target marked, Johnson ran to Henry, placed a gun to his ear, and fired. While Cooley remained at the scene to feign his non-involvement in the scheme, Frampton and Johnson returned to the Bronx via the private car service. Miraculously, Henry was not killed.

### C. Counts 1 and 2: Murder–for–Hire and Conspiracy to Commit Murder–for–Hire

Title 18, section 1958 of the United States Code provides:

> Whoever travels in or causes another ... to travel in interstate or foreign commerce, or uses or causes another ... to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States *as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value,* or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

18 U.S.C. § 1958(a) (emphasis added).[3] The federal murder-for-hire statute proscribes a very limited category of behavior; only those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are punishable under § 1958. *See United States v. Washington,* 318 F.3d 845, 854 (8th Cir.2003) ("The consideration requirement of [§ 1958] has been interpreted in the traditional sense of

---

**3.** Both the parties and the district court referred to Frampton and Johnson's crime as attempted murder-for-hire, presumably due to the fact that Henry was not actually killed. Although understandable, we note that such a characterization is technically inaccurate. According to the plain language of § 1958,

the act of traveling in, or using a facility of, interstate commerce, coupled with the *intent* that a murder take place in consideration of anything of pecuniary value, is itself a substantive offense punishable by ten years' imprisonment.

a bargained-for exchange."); *United States v. Hernandez,* 141 F.3d 1042, 1057 (11th Cir.1998) (noting that the language of § 1958 "undeniably contemplates a quid-pro-quo (or at least the promise of such) between the parties to the transaction, the murderer and the solicitor"). Moreover, the reach of § 1958 is further limited by the requirement that this payment take the form of "anything of pecuniary value," defined as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1).

Against this backdrop, the relevant inquiry becomes whether the evidence was sufficient to establish that Frampton and Johnson intended that the murder of Henry take place in exchange for the provision of, or a promise to pay, anything of pecuniary value. We agree with the district court that this question must be answered in the negative.

In seeking to reinstate the jury verdict, the Government marshals various pieces of the evidence. First, and perhaps most importantly, Cooley testified that he and Frampton agreed to enlist the services of Johnson as the triggerman, and that Johnson agreed to act as such. Second, Cooley also stated that he did not arrange for a backup in the event that Johnson had second thoughts, because he knew that Johnson was "capable of doing it." (Jt.App. at 410). Third, the driver of the private car service, Caine Cassidy, stated that during the return journey to the Bronx, Johnson admitted that "he does this for a living, this wasn't his first one." (*Id.* at 165). Finally, Emekah Hodge, Johnson's girlfriend, testified that Johnson was unemployed at the time of the shooting.

The Government argues that from all this evidence, the jury could reasonably infer that Johnson was a professional hitman, and that his role in the plot to murder Henry was just another "job" for which he would receive compensation. We disagree. Certainly the evidence to which the Government refers was sufficient to demonstrate that Johnson and Frampton intended that the murder of Henry take place and reached an agreement toward that end. The more troublesome area, however, is whether that agreement was supported by the type of consideration envisioned by § 1958. The only evidence on this point came from Cooley, who testified on direct examination as follows:

Q   And what consideration was [Johnson] going to get out of this?

A If he needed a favor from me, he'd get a favor.

Q   Well, when you say favor, what do you mean?

A Anything.  Anything he need.

(*Id.* at 409).  No doubt acknowledging that evidence of consideration in the form an unspecified "favor" appears inconsistent with the statutory text, the Government argues that other portions of Cooley's testimony provided the jury with a basis upon which to infer that the "favor" was synonymous with "anything of pecuniary value." 18 U.S.C. § 1958(a).

In particular, the Government refers to an incident recounted during Cooley's testimony involving a rival crack enterprise. This enterprise, which operated out of a neighboring residence, posed a threat to the continued economic success of the 41 Ingalls enterprise.  Cooley testified that this threat immediately ceased once he and Frampton spoke with the leader of the enterprise, because they, unlike Henry, were well-respected in the crack cocaine trade.  The Government argues that this incident demonstrated that a "favor" from Cooley not only carried an inherent "street

value," but also was capable of conferring significant economic benefit upon its recipient.

■ The federal murder-for-hire statute, however, does not speak in such colloquial terms. Moreover, the mere fact that the consideration offered by one (the solicitor) in exchange for another's (the murderer's) agreement to commit a murder *could* inure to the economic benefit of the latter is insufficient. Rather, there must be some evidence to establish that at the time the agreement was formed, the consideration was something the "primary significance" of which lay in its "economic advantage." 18 U.S.C. § 1958(b)(1).[4] Although this standard may be satisfied where the consideration is sale-level quantities of drugs, *see, e.g., Washington,* 318 F.3d at 854 (finding the evidence sufficient to support a conviction under § 1958 where the consideration was two-and-one-half ounces of heroin, an amount "normally associated with distribution and sale"), or valuable firearms, *see United States v. Richeson,* 338 F.3d 653, 657 (7th Cir.2003) (finding the consideration element of § 1958 established based on evidence that "[t]he payment offered took the form of money to buy the murder weapons, with the promise to allow the murderer to keep the weapon when he finished the job"), we hold that consideration in the form of a "favor" is insufficient to support a conviction under § 1958, at least in the absence of evidence suggesting that either party had an understanding as to the form that it would actu-

ally take. *Cf. United States v. Garcia,* 848 F.2d 1324, 1326 (2d Cir.1988) (evidence demonstrated that the term "two favors" was slang for two kilograms of cocaine), *rev'd on other grounds sub nom. Gomez v. United States,* 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989).

In advocating a broad interpretation of the phrase "anything of pecuniary value," the Government also refers to several portions of the Sentencing Guidelines that use the term "pecuniary gain," *see, e.g.,* U.S. SENTENCING GUIDELINES MANUAL § 2Q2.1 (2002), and caselaw interpreting them. *See United States v. Black,* 116 F.3d 198, 202–03 (7th Cir.1997) (explaining that the phrase "for pecuniary gain" used in U.S.S.G. § 2G2.2(b)(2) "is a broad concept itself, and it does not exclude the possibility of swaps, barter, in-kind transactions, or other valuable consideration"). These authorities are inapposite. As we have already stated, the language of § 1958 is clear. Just as it does not speak in terms of "street value," it does not use the phrase "pecuniary gain." *See United States v. Wicklund,* 114 F.3d 151, 153–54 (10th Cir.1997) (noting that "[i]f Congress had intended [§ 1958] to cover murder in expectation of pecuniary gain it could have drafted it to do so, as it did in other statutes").

We therefore hold that the district court did not err in entering a judgment of acquittal as to both Frampton and Johnson on Counts 1 and 2.[5]

---

4. Whether this element is to be determined from the point of view of the solicitor, the murderer, or some third party (*i.e.,* a reasonable person) is a question we need not decide on the facts of this case.

5. Due to our conclusion that the evidence was insufficient to establish an essential element of the offense of murder-for-hire, we also agree with the district court that Frampton and Johnson's conviction for conspiracy to

commit that offense cannot stand. *See United States v. Pinckney,* 85 F.3d 4, 8 (2d Cir.1996) ("Although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, it must prove that the intended future conduct they ... agreed upon include[s] all the elements of the substantive crime.") (quotations and citations omitted).

### D. Count 3: Commission of a Violent Crime in Aid of Racketeering

Title 18, section 1959 of the United States Code imposes criminal liability on anyone who:

> *for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity,* murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do . . . .

18 U.S.C. § 1959(a) (emphasis added). As set forth in the Indictment and advanced during the trial, the Government sought the conviction of Frampton and Johnson on differing theories. The Government alleged that Frampton, with the intended purpose of maintaining or increasing his own position in the 41 Ingalls enterprise, willfully caused Johnson to perpetrate a crime of violence against Henry. Frampton's liability under § 1959 therefore attached by virtue of 18 U.S.C. § 2(b), which punishes as a principal anyone who "willfully causes an act to be done which if directly performed by him" would constitute a federal offense. With regard to Johnson, the Government alleged that by committing the crime of violence necessary to support Frampton's conviction under § 1959 as a principal, Johnson acted as an aider and abettor. Thus, Johnson's liability under § 1959 was premised upon 18 U.S.C. § 2(a), which also punishes as a principal anyone who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense. We now consider the sufficiency of the evidence to support each theory.

### 1. Defendant Frampton

In his cross-appeal, Frampton does not appear to challenge the district court's conclusion that because he willfully caused Johnson to commit a crime of violence against Henry, that act could be directly attributed to Frampton by virtue of 18 U.S.C. § 2(b). Instead, Frampton argues that the evidence was insufficient to establish that he possessed the *mens rea* necessary for conviction under § 1959, to-wit: that the act was caused to be committed with the intent to maintain or increase his position in the 41 Ingalls enterprise.

■ Frampton's argument can be divided into two parts. First, he argues that the intent that an individual maintain or increase his position in a racketeering enterprise logically presumes that he was a member of that enterprise in the first place, a conclusion that was unsupported by the evidence. Second, even assuming that the evidence demonstrated that he was a member of the 41 Ingalls enterprise, it was insufficient to prove that he acted with the intent of maintaining or increasing his position. Our review of the entire record leads us to reject both of these contentions.

In arguing that he was not a member of the 41 Ingalls enterprise, Frampton focuses on the following trial testimony of Henry, elicited during cross-examination by Frampton's attorney:

Q And when [Frampton] arrived [in Troy] in 1998, December, you didn't give him drugs to sell for you, correct?

A No.

Q He had his own drug?

A Yes.

Q According to your testimony, correct?

A Yes.

Q He wasn't working for you?

A No.

Q He wasn't giving you any of the money that he would get from drugs?

A No.

Q You didn't have a 60/40 deal with Mr. Frampton, did you?

A No.

Q He knew his own people in Troy?

A Somewhat, yes.

(Jt.App. at 338–39). Frampton asserts that due to Henry's position as the leader of the 41 Ingalls enterprise, Henry was the person best-suited to paint a true and accurate portrait of its membership. Because Henry explicitly denied that Frampton was a member of the 41 Ingalls enterprise, Frampton argues that the jury was precluded from reaching a contrary conclusion. We disagree.

■ It is well-established that the evaluation of witness credibility is a function of the jury, see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and necessarily encompasses the prerogative to wholly reject any testimony offered by a witness deemed untruthful. In this case, the Government presented testimony from several witnesses to refute that of Henry. Other members of the enterprise recounted Frampton's activities while at 41 Ingalls, including the sale of crack cocaine, the supply of crack cocaine to others within the enterprise for resale, and the elimination of threats posed by rival dealers residing in Troy. Moreover, Cooley testified that he and Frampton took part in the

enterprise on a basis equal to that of Henry and shared in its profits. In view of the foregoing, we believe that the evidence presented at trial was more than adequate for a rational jury to conclude that Frampton was a member of the 41 Ingalls enterprise.[6]

■ Frampton also argues that even assuming the evidence was sufficient to establish his membership in the 41 Ingalls enterprise, it nevertheless failed to demonstrate that his complicity in the plot to murder Henry was motivated by an intent to maintain or increase his position therein. Frampton correctly asserts that the only evidence offered to establish this element of § 1959 was provided by Cooley, who testified on direct as follows:

Q What plan did you make about what would happen after Henry was dead?

A That me and [Frampton], we'd continue to sell drugs out of 41 Ingalls.

. . . .

Q Okay. Was the idea you were going to just take over Henry's operation?

A Yes.

Q Was there going to be anything different about the operation other than the fact that it was you and [Frampton] and not Henry?

A Yes, that's it, that's the deal.

(Jt.App. at 408–09). Frampton assails Cooley's credibility, pointing out that he testified on behalf of the Government in the hopes of receiving a reduced sentence.[7]

---

6. Frampton also argues that the evidence was insufficient to establish his participation in any conspiracy to distribute crack cocaine, and that the district court therefore erred in refusing to set aside his conviction on Count 4. The litany of evidence discussed above in connection with Count 3 applies with equal

force to Count 4, however, and negates such a conclusion.

7. Cooley was also indicted for his role in the plot to murder Henry. Prior to trial, he entered into a plea and cooperation agreement, whereby he testified on behalf of the Government at Frampton and Johnson's trial in exchange for a reduced sentence.

We note, however, that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction," *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir.1979), and that such a principle has deep roots in our system of justice. *See Weiler v. United States*, 323 U.S. 606, 608, 65 S.Ct. 548, 89 L.Ed. 495 (1945); *see generally* 7 WIGMORE, EVIDENCE § 2034 (Chadbourn rev. 1978) ("In general, the testimony of a *single witness*, no matter what the issue or who the person, *may legally suffice as evidence upon which the jury may found a verdict*."). Nevertheless, Frampton argues that recent developments have demonstrated the fallibility of such an approach, and invites this court to adopt a rule that the testimony of a single, uncorroborated, and potentially biased witness, standing alone, is generally *insufficient* to support a conviction. We decline this invitation and instead reaffirm our prior precedent.[8]

Based upon the above analysis, we affirm that portion of the district court's order upholding the jury verdict as to Frampton on Count 3.

### 2. *Defendant Johnson*

As briefly discussed above, the Government's theory with respect to Johnson was that by committing a crime of violence at Frampton's behest, Johnson aided and abetted Frampton's violation of § 1959. However, because that very same act had already been attributed to Frampton by virtue of the operation of § 2(b) and used to support his conviction under § 1959, the district court was presented with a difficult legal question: whether an individual can aid and abet the commission of a crime by committing an act that is an indispensable element of the principal's substantive offense. The district court answered this question in the negative, reasoning that "aiding and abetting requires activity that is integral to the illegal conduct yet extraneous of it. That is to say, aiding and abetting connotes assisting or facilitating illegal conduct without directly engaging in that conduct." (Dist. Ct. Order at 14). To uphold the Government's theory, according to the district court, would be tantamount to an endorsement of the legal position that an individual can aid and abet himself.

The Government argues that the district court's rationale is not only novel, but inconsistent with the traditional understanding of the law of aiding and abetting. *See, e.g., United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938). Johnson contends that the district court's analysis was proper, although he has not cited, nor has our own

---

**8.** On cross-appeal, Frampton also raises two other issues related to Count 3. First, he challenges the district court's jury instruction, asserting that it failed to adequately explain the difference between an "enterprise" and "racketeering activity." In particular, Frampton asserts that the district court had an obligation to provide the jury with the definition of these terms set forth in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). We find this argument lacking in merit. In charging the jury on the elements necessary to support a conviction under § 1959, the district court utilized the definitions of "enterprise" and "racketeering activity" set forth in the statute. *See United States v. Alfisi*, 308 F.3d 144, 150 (2d Cir.2002) ("Where a district court's jury instructions accurately track the language and meaning of the relevant statute, we generally will not find error."). In fact, the definitions in *Turkette* to which Frampton refers were themselves merely a paraphrasing of the relevant statutory language. *See Turkette*, 452 U.S. at 583, 101 S.Ct. 2524.

Frampton also claims that he was denied his Sixth Amendment right to effective assistance of counsel by virtue of his counsel's failure to object to the inadequacy of the district court's jury instruction. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Having found no error in that instruction, we hold this claim must fail.

research disclosed, any authority to support his position. We need not resolve this issue, however, for we find that the district court's entry of a judgment of acquittal in favor of Johnson can be supported on another basis. *See United States v. Yousef*, 327 F.3d 56, 156 (2d Cir.2003) ("We are free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied.") (quotations and citations omitted).

▓▓▓▓ In order to secure a conviction for aiding and abetting under 18 U.S.C. § 2(a), the Government must prove: (1) that the underlying crime was committed by someone other than the defendant; and (2) that the defendant either acted or failed to act with the specific intent of enabling its commission. *See, e.g., United States v. Samaria*, 239 F.3d 228, 234–35 (2d Cir.2001). As our previous analysis has demonstrated, the Government's evidence was sufficient to establish Frampton's guilt under § 1959, thereby satisfying this first element. Moreover, our conclusion that Frampton's conviction is sustainable on the basis of § 2(b) liability necessarily implies that the evidence was also sufficient to establish that Johnson committed an act. The key question, then, is whether the Government proved that this act (Johnson's crime of violence against Henry) was performed with the requisite intent. We find that it did not.

▓▓▓▓ The intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would tend to advance some nefarious purpose of the principal. Rather, the defendant must act with the specific intent of facilitating or advancing the principal's commission of the underlying crime. *See United States v. Pipola*, 83 F.3d 556, 562 (2d Cir.1996) (noting that "aiding and abetting requires a defendant's

conscious assistance in the commission of the *specific underlying crime* ") (emphasis added); *see also United States v. Wiley*, 846 F.2d 150, 154 (2d Cir.1988). Applied to the facts of the present case, the burden was on the Government to prove that at the time Johnson assaulted Henry, he knew that Frampton was seeking to increase his position in the 41 Ingalls enterprise and acted toward that end. *See United States v. Concepcion*, 983 F.2d 369, 383 (2d Cir.1992) (discussing liability for aiding and abetting in the context of a violation of § 1959 and noting that "[u]nder § 2(a), an aider and abetter [sic] must share in the principal's essential criminal intent") (quotations and citations omitted).

At oral argument, however, the Government conceded that it could point to no direct evidence demonstrating that Johnson knew of Frampton's criminal intent, *i.e.,* his desire to enhance his position in the 41 Ingalls enterprise. Moreover, the circumstantial evidence proffered by the Government to support such an inference—that Johnson and Cooley were friends, and therefore Johnson must have realized the real purpose behind his role in the plot to murder Henry—is far too attenuated.

E. *Count 5: Use of a Firearm During and in Relation to a Crime of Violence*

Title 18, section 924 of the United States Code provides additional criminal penalties for anyone who:

> during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . .

18 U.S.C. § 924(c)(1)(A); *compare id.* § 924(c)(1)(A)(i) (providing for an additional minimum five-year term of imprisonment for the use, carry, or possession of a firearm), *and id.* § 924(c)(1)(A)(ii) (providing for an additional minimum seven-year term if the firearm is brandished), *with id.* § 924(c)(1)(A)(iii) (providing for an additional minimum ten-year term if the firearm is discharged).

■ As set forth in the Indictment, the only party charged in Count 5 was Johnson. Moreover, the Government sought Johnson's conviction on alternate theories; he either acted as a principal in the violation of § 924(c) or aided and abetted Frampton's violation of the statute. Under these circumstances, our precedent normally dictates that we consider whether the Government's evidence was sufficient to support the jury's verdict on either theory. *See United States v. Masotto,* 73 F.3d 1233, 1241 (2d Cir.1996) ("When the jury is properly instructed on two alternative theories of liability, as here, we must affirm when the evidence is sufficient under either of the theories.") (citing *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)). The rationale for this rule, as the Supreme Court has explained, is that:

> in any criminal case a general verdict and judgment on an indictment or information containing several counts cannot be reversed on error, if any one of the counts is good and warrants the judgment, because, *in the absence of anything in the record to show the contrary,* the presumption of law is that the court awarded sentence on the good count only.

*Griffin,* 502 U.S. at 49–50, 112 S.Ct. 466 (emphasis added) (quotations and citations omitted).

In this case, however, the rationale behind the rule is inapplicable. Rather than calling for a "general verdict," wherein the jury was only required to pronounce its determination as to the ultimate fact of guilt or innocence, the verdict form utilized by the district court in connection with Count 5 specifically required the jury to indicate the precise theory upon which its conviction of Johnson rested. *Cf. id.* at 48, 112 S.Ct. 466 (noting the trial court's denial of the defendant's request for special interrogatories to the jury). In other words, the jury was asked whether it found Johnson guilty of a violation of § 924(c) as either a principal or an aider and abettor. The record makes clear that the jury found Johnson guilty only on the theory that he acted as a principal. Thus, unlike the district court, we do not endeavor to determine whether Johnson's conviction could be supported on an aiding and abetting theory.

In order to convict Johnson under § 924(c) as a principal, the Government was required to prove that Johnson himself committed a federal crime of violence, and that during and in relation to that offense, he knowingly used, carried, brandished, or discharged a firearm. *See United States v. Desena,* 287 F.3d 170, 180 (2d Cir.2002). We find, as did the district court, that the Government failed to carry this burden. The federal crimes of violence charged by the Government were murder-for-hire and the commission of a violent crime in aid of racketeering, the very same substantive offenses charged in Counts 1 through 3 of the Indictment. Having already affirmed the district court's entry of a judgment of acquittal in favor of Johnson with respect to those charges, however, the predicate crime of violence necessary to sustain Johnson's conviction on a theory that he acted as a principal is lacking. *See United States v. Polanco,* 145 F.3d 536, 540 (2d Cir.1998) (reversing a defendant's § 924(c) conviction where the evidence was insufficient to

support his conviction for the underlying crime of violence charged by the government).

## F. *Conclusion*

In summary, the district court granted Johnson's motion for a judgment of acquittal with respect to Counts 1, 2, 3, and 5. Based on the foregoing analysis, we affirm the district court's judgment in this regard.

The district court also granted Frampton's motion for a judgment of acquittal on Counts 1 and 2, but denied his motion for a judgment of acquittal, as well as his motion for a new trial, with respect to convictions under Counts 3, 4, 6, and 7. Counts 6 and 7 are not before us; we affirm the judgment of the district court on Counts 1, 2, 3, and 4 as they pertain to Frampton.

The mandate in this case will be held pending the Supreme Court's decision in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 11, —— L.Ed.2d ——, 2004 WL 1713654 (August 2, 2004) (mem.); *United States v. Fanfan*, —— U.S. ——, 125 S.Ct. 12, —— L.Ed.2d ——, 2004 WL 1713655 (Aug. 2, 2004) (mem.). Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not reconsider those portions of its opinion that address the defendant's sentence until after the Supreme Court's decision in *Booker* and *Fanfan*. In that regard, the parties will have until 14 days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker* and *Fanfan*.