WESLEY, Circuit Judge,
dissenting:
I dissent from the majority’s holding as to Count 4, in which Todd Broxmeyer was convicted by a jury of aiding and abetting the transportation of a 15-year-old girl over state lines with the intent to engage in unlawful sexual activity with her.
This case illustrates the importance of the institutional role that we play in a direct appeal challenging the sufficiency of the evidence supporting a criminal defendant’s conviction. That role requires a delicate balance. On the one hand, we must respect the jury’s essential place in our criminal justice system; that respect requires us to defer to a jury’s conclusions regarding the evidence at a trial. In other words, we “may not usurp the role of the jury by substituting [our] own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury.” United States v. Heras, 609 F.3d 101, 105 (2d Cir.2010) (internal quotation marks omitted). On the other hand, fundamental principles of justice require that a jury’s decision to convict must rest on competent evidence adduced by the government at trial, and we must be satisfied that the evidence is capable of establishing the defendant’s guilt beyond a reasonable doubt. See id. In short, we must accept a jury’s assessment of actual evidence, but not its speculation, when reviewing the imposition of criminal sanctions.
Based on these principles, I agree with the majority that there was insufficient evidence to support Broxmeyer’s conviction as to Counts 1 and 2. Vacatur is appropriate because these Counts relate to two sexually explicit photographs that A.W. took of herself, and there is no evidence in the record regarding when during the year 2007 those specific images were produced.
*131 But the same cannot be said with respect to Count 4. To obtain a conviction on this Count, the government was required to prove beyond a reasonable doubt that: (1) Broxmeyer transported K.M., or caused her to be transported, over the Pennsylvania-New York border, (2) while intending to engage in illegal sexual activity with her, and (3). that KM. was less than eighteen years old at the time. See Op. at 128. With respect to the first element, which is the only one in dispute, the government was permitted to seek a conviction based on an aiding and abetting theory. See id.
Our role here is clear: We must assess the evidence regarding why it is that L.M. drove his daughter from Pennsylvania to New York on the morning of December 8, 2007.[1] The question for the jury was whether the government proved, beyond a reasonable doubt, that Broxmeyer caused L.M. to transport KM. across state lines by promising to bring her home to Pennsylvania the next day. The jury answered “yes” to that question. The only issue for us, then, is whether there was sufficient evidence to support its conclusion. I would answer that question in the affirmative.
One of the most important portions of L.M.’s testimony regarding this issue came during his direct examination. I quote it here in full:
Q What happened on that weekend as far as your availability to transport [KM.] back and forth or [KM.] not being able to get back and forth?
A Earlier in the week [K.M.] expressed interest in going up [to New York] for a practice session, and one of her friends from the team ... offered to put her up for the night, so I would just need to drop her off on Saturday midday after her other responsibilities. She played for another club team down in ... Pennsylvania, called Exealibur, so she had practice in the morning, and we came up in the afternoon on that particular day, but earlier in the week — [K.M.] expressed interest in coming up, but my issue was really can’t [sic] spend the night because my son, who’s 9, was serving his First Holy Communion on Sunday, December 9. Actually, it was a practice [for the Holy Communion ceremony] but it was required and mandatory for the parents to partake in the service that morning, so it would be difficult for me to come up and pick her up in the morning.
I said that wouldn’t be a big issue as long as [KM.’s friend] wouldn’t mind keeping you to the afternoon and I can come up maybe mid to late afternoon. Didn’t seem like there was a big issue with that. But I guess as things developed in the course of that week, Todd Broxmeyer offered to, since he’s going to be traveling down to New Jersey for a Sunday practice, that he could drop *132 [K.M.] off at home. Again, I believe he lived about five, ten minutes off of the exit for Pennsylvania Turnpike downtown exit. It seemed reasonable, however reluctant that we were.
Def.’s App. at 85-87, Tr. at 205-07.
The jury could infer from this and other testimony that “earlier in the week” that began on December 3, 2007, Z.M. “expressed interest” in attending practice in New York on December 8 and spending that night with a friend. Id. at 86, Tr. at 206. At the time of the request, L.M. “said” to K.M. “that wouldn’t be a big issue as long as [your friend] wouldn’t mind keeping you to the afternoon” on Sunday. Id. (emphasis added). Thus, L.M.’s testimony suggested that he did not immediately agree to take KM. to the practice and instead imposed a condition precedent on the trip. And there was no testimony indicating that this condition was satisfied at any time, much less in advance of Broxmeyer’s intervening offer to drive K.M. home.
Specifically, L.M. went on to testify that, “as things developed in the course of that week, Todd Broxmeyer offered to ... drop [K.M.] off at home” on the day after the practice. Id. L.M. thought that plan “seemed reasonable, however reluctant that we were.” Id. at 86-87, Tr. at 206-07. L.M.’s “reluctan[ce]” did not arise out of distrust for Broxmeyer. Instead, L.M. expressed “a lot of reluctance” because the trip to New York would be too disruptive during the course of what was already going to be a busy weekend for the family. Id. at 88, Tr. at 208. He recalled asking K.M., “do you really want to do this, do you really need to go up there?” Id. This initial reluctance supports the inference that L.M. had not decided to drive K.M. to practice before Broxmeyer offered to drive her home. Indeed, L.M.’s reluctance suggests a possibility that is ignored by the majority: He might have declined to take her to New York altogether in the absence of Broxmeyer’s offer.
On or about December 7, 2007 — i.e., “[t]he day before” the practice — Broxmeyer contacted L.M. to “confirm[]” that he would drive K.M. home on December 9. Id.; see also id. at 99, Tr. at 219 (L.M. testifying on cross-examination that the “[transportation] issue was days before” and that he spoke with Broxmeyer “a couple days before going up [to New York]”). The existence of this “confirmed” plan takes on added significance in light of L.M.’s testimony that he would “never drop off [his] daughter if [he] didn’t know when and where she was going to be to and from.” Id. at 99, Tr. at 219. The jury was entitled to believe L.M.’s assertion and apply it to the facts about which he was testifying. In the absence of the plan with Broxmeyer, according to L.M., he would “never” have taken K.M. to New York. Put another way, it was because of Broxmeyer’s “confirmed” offer of a return trip that L.M. agreed to drive K.M. to the practice. Therefore, a rational fact finder could conclude that Broxmeyer’s offer to drive K.M. home caused L.M. to decide to bring her to New York on December 8. While L.M.’s testimony may not compel this result, our role does not permit us to resolve competing inferences supported by the record. The jury has already done that, and it has resolved them against Broxmeyer.
In an attempt to support its contrary holding, the majority takes selective quotations from L.M.’s testimony and asserts that K.M. “was going to attend practice [in New York] that Saturday, as she had done on prior occasions; her attendance was not contingent on Broxmeyer’s offer to drive her home on December 9.” Op. at 128. The common thread that unites each of the quotes cited by the majority is L.M.’s rec *133 ollection that he was confident at the time that he would have been able to pick K.M. up on Sunday. See id. The majority infers from L.M.’s confidence — as it must, because there was no testimony to this effect — that it was inevitable from the time K.M. first made the request that L.M. was going to take her to New York. However, the jury was not obligated to adopt this mode of analysis, and the majority improperly draws inferences against the government in relying on it.
The testimony quoted in the majority opinion that most supports its position that L.M. decided to take the trip before Broxmeyer’s offer of return transportation was elicited during the cross-examination of L.M.:
Q When did the plan change from the [parents of K.M.’s friend] giving your daughter a ride back home to Mr. Broxmeyer?
A Again, that was such — in passing I was either going to come all the way up or Todd had offered to drive her back down.
Def.’s App. at 100, Tr. at 220.
Even assuming, arguendo, that this testimony tended to establish that L.M.’s decision to drive K.M. to New York “was not contingent on Broxmeyer’s offer to drive her home on December 9,” Op. at 128, nothing required the jury to accept this response from L.M., or any other portion of his testimony, at face value. See United States v. Frampton, 382 F.3d 213, 221 (2d Cir.2004). For any number of reasons, a rational juror might reject this father’s recollection of his approach to that weekend, which was presented at trial from an ex post perspective that was likely tainted by hindsight bias resulting from the events that ultimately transpired.
Moreover, there was a basis in the record to justify disregarding the testimony from L.M. that suggested that Broxmeyer was irrelevant to the equation. Specifically, L.M.’s testimony was inconsistent with testimony from K.M., who recalled these events differently during her direct examination:
Q And what was your understanding as to how you would get home the following day on December 9?
A Well, my parents couldn’t come and get me the next day [on December 9] because my brother had First Holy Communion, so my parents asked if Todd [Broxmeyer could] bring me home and he said he could.
Def.’s App. at 108, Tr. at 228. KM.’s testimony sits in significant tension with L.M.’s suggestion that “[h]e had ‘no reservations’ about picking her up on Sunday afternoon.” Op. at 128. As she recalled, L.M. “couldn’t come” to get her on that day. The jury could therefore infer that: (1) in the absence of any other means for her to return home, L.M.’s initial “reluctance” would have carried the day and prevented the trip; and (2) but for Broxmeyer’s subsequent offer to drive K.M. home, L.M. would not have driven her to New York on December 8.
In sum, the contrast between the majority’s treatment of the sufficiency issues in this appeal lays bare the flaws in its analysis of Count 4. With respect to Counts 1 and 2, there was no evidence regarding when the two sexually explicit photographs at issue were produced. As a result, the jury could only speculate as to whether Broxmeyer caused A.W. to produce those photos. Therefore, I agree that the conviction as to Counts 1 and 2 must be vacated.
With respect to Count 4, however, the majority has invaded the province of the jury to cast aside the evidence supporting its verdict. Based on the evidence relating *134 to the sequence of events, L.M.’s initial “reluctance” about the trip, fLM.’s testimony that her parents “couldn’t” pick her up in New York, and the timing of L.M.’s communications with Broxmeyer, the jury was entitled to infer that it was Broxmeyer’s offer to drive K.M. home that caused L.M. to drive her to New York.
While the government’s case was not ironclad, it is an extraordinary thing to set aside a jury’s verdict. We must exercise that power sparingly, especially in the highly fact-intensive context of questions relating to causation. With respect to Count 4, it is unnecessary to disturb the jury’s verdict. Therefore, I dissent.

. I agree with the majority that it is appropriate to examine both "legs” of K.M.’s trip on December 8-9, 2007, Op. at 128, and that the government could not satisfy its burden by relying on the evidence relating to her return to Pennsylvania, see id. at 129-30. The text of 18 U.S.C. § 2423(a) requires that the requisite mens rea be formed at or prior to the time of the transportation in question. The jury could infer from the fact that Broxmeyer forced K.M. to perform oral sex on him as soon as he was alone with her — a circumstance he brought to be by taking her to an empty sports complex on the morning of December 9 — that he caused her to be transported to New York for that purpose. But that inference, which is based on the sequence and proximity of the transportation to the illegal sex act, is not available when the sex act precedes the transportation in question. See Op. at 129-30. As such, the return leg of K.M.'s trip cannot serve as the basis for defendant’s conviction on Count 4.