24-1532(L)
*United States v. Zhe Zhang*

# United States Court of Appeals
## For the Second Circuit

August Term 2024

Argued: April 9, 2025
Decided: April 28, 2025

Nos. 24-1532(L), 24-1615(Con)

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

ZHE ZHANG, a.k.a. Zack, QING MING YU, a.k.a. Allen Yu,

*Defendants-Appellants,*

ANTONY ABREU, a.k.a. Anthony, YOU YOU, a.k.a. Eddie,

*Defendants.*

Appeal from the United States District Court
for the Eastern District of New York
No. 22-cr-208, Carol Bagley Amon, *Judge.*

Before: WESLEY, SULLIVAN, and PARK, *Circuit Judges.*

Zhe Zhang and Qing Ming "Allen" Yu (together, "Defendants") appeal from judgments of conviction of the United States District Court for the Eastern District of New York (Amon, *J.*) after trial for one count of conspiracy to commit

murder for hire and one count of murder for hire, both in violation of 18 U.S.C. § 1958(a), in connection with the 2019 shooting of Yu's protégé, Xin "Chris" Gu. The district court sentenced both defendants to life imprisonment. On appeal, Defendants argue that (1) there was insufficient evidence that Zhang agreed with Yu to carry out the murder in exchange for something of pecuniary value; (2) the government violated Defendants' constitutional rights by changing its theory of pecuniary value mid-trial; (3) the government failed to turn over exculpatory evidence, which prejudiced Defendants; and (4) the district court erroneously assumed that section 1958(a) mandated a punishment of life imprisonment or death. We disagree.

*First*, we hold that a promise of providing business connections constitutes something of pecuniary value and thus the evidence was sufficient for the jury to find Defendants guilty of violating the murder-for-hire statute. *Second*, Defendants' argument that they had a freestanding due-process right not to be taken by surprise at trial by the government's theory of the case has no basis in Supreme Court or Second Circuit precedent and thus cannot amount to plain error. *Third*, Defendants were not prejudiced by the withheld evidence. *Fourth*, we agree with the district court and hold, as a matter of first impression, that section 1958(a) imposes a mandatory minimum sentence of life imprisonment. Accordingly, we **AFFIRM** the judgment of the district court.

AFFIRMED.

> ALEXANDRA A.E. SHAPIRO, Shapiro Arato Bach LLP, New York, NY (Alice Buttrick, Shapiro Arato Bach LLP, New York, NY; Henry E. Mazurek, Jason I. Ser, Meister Seelig & Fein PLLC, New York, NY, *on the brief*), *for Defendant-Appellant Zhe Zhang*.
>
> JOSEPH PACE, J. Pace Law, PLLC, New York, NY (James Kousouros, The Law Offices of James Kousouros, New York, NY, *on the brief*), *for Defendant-Appellant Qing Ming Yu*.

2

DEVON LASH (Saritha Komatireddy, Gabriel Park, *on the brief*), Assistant United States Attorneys, *for* John J. Durham, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Zhe Zhang and Qing Ming "Allen" Yu (together, "Defendants") appeal from judgments of conviction of the United States District Court for the Eastern District of New York (Amon, *J.*) after trial for one count of conspiracy to commit murder for hire and one count of murder for hire, both in violation of 18 U.S.C. § 1958(a), in connection with the 2019 shooting of Yu's protégé, Xin "Chris" Gu. The district court sentenced both defendants to life imprisonment. On appeal, Defendants argue that (1) there was insufficient evidence that Zhang agreed with Yu to carry out the murder in exchange for something of pecuniary value; (2) the government violated Defendants' constitutional rights by changing its theory of pecuniary value mid-trial; (3) the government failed to turn over exculpatory evidence, which prejudiced Defendants; and (4) the district court erroneously assumed that section 1958(a) mandated a punishment of life imprisonment or death. We disagree.

*First*, we hold that a promise of providing business connections constitutes something of pecuniary value and thus the evidence was sufficient for the jury to find Defendants guilty of violating the murder-for-hire statute. *Second*, Defendants' argument that they had a freestanding due-process right not to be taken by surprise at trial by the government's theory of the case has no basis in Supreme Court or Second Circuit precedent and thus cannot amount to plain error. *Third*, Defendants were not prejudiced by the withheld evidence. *Fourth*, we agree with the district court and hold, as a matter of first impression, that section 1958(a) imposes a mandatory minimum sentence of life imprisonment. Accordingly, we AFFIRM the judgment of the district court.

## I.    BACKGROUND

Yu was the owner of Amaco, a development company based in Manhattan that managed the renovation of rental properties across New York City. At its height, Amaco was responsible for over a thousand apartment projects, and in 2017, it earned profits of approximately $20 million. In 2015, Gu began working at Amaco as a translator and excelled at his job, soon moving up the ranks to the position of project manager where he oversaw high-value renovation projects and recruited lucrative new clients for the business. Yu treated Gu like a family

4

member and viewed him as the heir apparent to Amaco. But that all changed in August 2018 when Gu left Amaco to form his own development company and began luring away some of Amaco's employees and clients, even taking over a project that was expected to bring in more than $1 million in profits to Amaco. Furious at Gu's disloyalty, Yu sought retribution. In October 2018, Yu contacted his nephew, You You, to discuss murdering Gu and suggested that You You contact Zhang for help in carrying out the murder. You You then arranged a meeting with Zhang and Yu in which Zhang agreed to participate in the murder in exchange for Yu providing him with business connections in the real-estate industry. In the months following that meeting, You You and Zhang began planning the murder and recruiting additional members of the conspiracy, including Antony Abreu, who would be the shooter.

In January 2019, Yu informed You You that Gu would be hosting a Chinese New Year party in Flushing, Queens, and suggested committing the murder there. After identifying the nightclub where the party was being held, You You formulated a plan with Zhang and Abreu in which You You would alert Abreu and Zhang as Gu exited the nightclub, Abreu would shoot Gu, and Zhang would be the getaway driver. At approximately 2:30 a.m. on February 12, 2019, Gu

5

stepped outside the nightclub, and as Gu was waiting for an Uber, Abreu approached him and shot him multiple times. Zhang then picked up Abreu in a white Honda Accord and fled the scene. Gu died later that evening.

On May 4, 2022, a grand jury in the Eastern District of New York returned an indictment charging Zhang and Yu with murder for hire and conspiracy to commit murder for hire, both in violation of 18 U.S.C. § 1958(a). Following their arrest in May 2022, Zhang and Yu proceeded to a jury trial, which began in September 2023 and lasted three weeks. At trial, the government presented testimony from twenty-four witnesses – including You You, who agreed to testify as a cooperating witness – as well as surveillance footage of the murder, photographs, social-media posts, vehicle records, phone records, text messages, cell-site location data, and physical evidence. Defendants, in turn, argued that there was no evidence linking them to the murder, that Zhang had no motive to participate in the killing, and that Yu did not promise Zhang anything of pecuniary value, as required by the murder-for-hire statute. Defendants contended that You You had a long history of violence and a clear motive to kill Gu and place the blame on others. After a day and a half of deliberations, the jury

6

found Defendants guilty on both counts.  The district court ultimately sentenced Zhang and Yu to life imprisonment.  Defendants timely appealed.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

Defendants first argue that the evidence introduced at trial was insufficient to prove an agreement to commit the murder in exchange for something of pecuniary value.  We review a challenge to the sufficiency of the evidence *de novo*. *See United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014).  Nevertheless, we have explained that "a defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden as the standard of review is exceedingly deferential."  *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citation and internal quotation marks omitted).  Indeed, in reviewing a sufficiency challenge, "we must view the evidence in the light most favorable to the [g]overnment, crediting every inference that could have been drawn in the [g]overnment's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015) (internal quotation marks omitted).  We may not overturn a

conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The federal murder-for-hire statute prohibits traveling in interstate or foreign commerce, or using a facility of interstate commerce, "with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a). The statute, in turn, defines "anything of pecuniary value" as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." *Id.* § 1958(b)(1). Thus, to prove the pecuniary-value element of a murder-for-hire count, the government must establish "that at the time the agreement was formed, the consideration was something the primary significance of which lay in its economic advantage." *United States v. Frampton*, 382 F.3d 213, 219 (2d Cir. 2004) (internal quotation marks omitted). We have also held that to sustain a conviction under this statute, "there must be a *quid-pro-quo* (or at least the promise of such) between the parties to the transaction." *United States v. Babilonia*, 854 F.3d 163, 174 (2d Cir. 2017) (internal quotation marks omitted).

8

Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient proof of an agreement to commit murder in exchange for pecuniary value. You You testified at trial regarding an October 17, 2018 meeting with Yu and Zhang, during which Yu promised to pass along his company's business connections so that Zhang could start a similar company of his own. *See* J. App'x at 454. According to You You, Zhang would "be financially benefitted very well from the deal" and "would be making great money just like [Yu] does, making millions." *Id.* at 454–55. You You also recounted a series of events following the murder, which provided further evidence of this agreement. For example, during a meeting with Zhang a month after the murder, Yu explained that he needed "a little time till the heat dies off a little bit" before he could "compensate what he promised" by handing over the business connections. *Id.* at 516. Then, in May 2019, Yu paid You You $150,000 for the murder, but You You did not share this money with Zhang because Yu had promised that Zhang would receive the business connections as his payment for the murder. Ultimately, Yu did not provide Zhang with those business relationships and instead paid him $30,000 in December 2019.

You You remained consistent in his recollection of events even when cross-examined. He reiterated that Yu "said that he's going to give [Zhang] the connection to his real estate company" so that Zhang could "run a company like Amaco." *Id.* at 581. You You's testimony was also corroborated by other evidence introduced at trial. For example, another co-conspirator testified that You You told him that Zhang "wanted a percentage of [Yu's] company" for participating in the murder. *Id.* at 734. Moreover, the government introduced text messages and bank records reflecting that after Zhang repeatedly asked for Yu to make good on his promise, Yu eventually paid him $30,000. The jury could certainly infer that this $30,000 was either a partial payment or substitute for the handing over of Yu's business connections, thus constituting circumstantial evidence of the original agreement. *See Babilonia*, 854 F.3d at 176 ("[P]ost-agreement course of conduct is circumstantial evidence of [the solicitor's] specific intent at the time [the murderer] was hired to provide . . . compensation for the murder's completion."). At the end of the day, Defendants' challenge boils down to an argument that You You's testimony about the conspirators' agreement was not credible. But on sufficiency review, we are required to "defer[] to the jury's assessment of witness credibility." *Brock*, 789 F.3d at 63.

Defendants also argue that Yu's promise to provide Zhang with business connections was too "nebulous" to constitute something of pecuniary value. Zhang Br. at 31. We disagree, and hold that the promise of providing business connections is sufficient to constitute something of pecuniary value within the meaning of the murder-for-hire statute. Defendants primarily rely on our decision in *Frampton*, which held that "consideration in the form of a 'favor' is insufficient to support a conviction under [section] 1958, at least in the absence of evidence suggesting that either party had an understanding as to the form that it would actually take." 382 F.3d at 219. But this case is unlike *Frampton*, where the solicitor made only a vague promise to give the murderer "[a]nything he need[ed]." *Id.* at 218 (internal quotation marks omitted). The promise here was far more specific and involved Yu providing Zhang with "all of his real estate connections [with] all the landlords in Manhattan." J. App'x at 643. At its height, Amaco had over a thousand apartment projects and generated millions. Yu's promise would allow Zhang to "run a company like Amaco," *id.*, and to "mak[e] millions," *id.* at 455.

Accordingly, in light of all the evidence presented at trial, we conclude that "the primary significance" of Yu's promise to provide Zhang with business connections clearly "lay in its economic advantage," and thus was sufficient to

11

constitute something of pecuniary value within the meaning of section 1958. *Frampton*, 382 F.3d at 219 (internal quotation marks omitted).

## B.    Ability to Present a Meaningful Defense

Defendants next argue that the government made a mid-trial change to its theory of what Yu promised Zhang in exchange for participating in the murder, thereby depriving Defendants of the ability to present a meaningful defense.  But the record makes clear that Defendants never presented this argument to the district court below and, in any event, the theory has no basis in Supreme Court or Second Circuit law.

In their Rule 29 motions, Defendants argued that the government's purported change in theory constituted a constructive amendment to, or prejudicial variance from, the indictment.  Perhaps recognizing the difficulty of prevailing on a constructive amendment or prejudicial variance claim, Defendants have disclaimed reliance on either theory and instead now assert a broader constitutional claim based on the Fifth and Sixth Amendments that a defendant has the right not to be taken by surprise at trial by the government's theory of the case.  Because Defendants did not raise this constitutional challenge before the

district court, our review is confined to plain error.  *See United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018).

To establish plain error, a defendant must show "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the [defendant's] substantial rights; and (4) the error seriously affects the fairness, integrity[,] or public reputation of judicial proceedings."  *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020) (internal quotation marks omitted).  The defendant bears the burden of establishing each of these elements.  *See United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020).  We have warned that "reversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."  *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (internal quotation marks omitted).  Indeed, "[w]e typically will not find [plain] error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court."  *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) (internal quotation marks omitted).

Defendants assert that there is a broader "genus of constitutional notice claims" – beyond constructive amendment and prejudicial variance claims – and

that the "core question" is "whether the accused was taken by surprise" at trial. Yu Reply Br. at 3 (internal quotation marks omitted). But Defendants point to no binding precedent from this Circuit that recognizes such a freestanding constitutional notice claim. They instead rely on out-of-circuit authority or dicta from a handful of our precedents that bear no resemblance to the case at hand. In fact, if Defendants' theory were correct, it would render a whole corpus of our case law essentially meaningless since a defendant could *always* raise an argument based on surprise even if he could not meet the rigorous standards of establishing a constructive amendment or prejudicial variance. Accordingly, because Defendants point to no "clearly established precedent" within this Circuit that was violated, their challenge must fail. *Whab*, 355 F.3d at 158 (internal quotation marks omitted).

### C.    *Brady* Violations

Defendants next contend that their rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated when the government failed to turn over certain exculpatory evidence. Under *Brady* and its progeny, "the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." *United States v. Payne*, 63 F.3d 1200,

14

1208 (2d Cir. 1995). To prevail on a *Brady* claim, the defendant bears the burden of establishing "(1) that the government failed to disclose favorable evidence, and (2) that the evidence it suppressed was material." *Id.* (internal quotation marks omitted). The Supreme Court has explained that under the second prong "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In other words, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). We review *de novo* a district court's determination of whether the withheld evidence was material as a matter of law but afford "great weight" to "[t]he trial judge's factual conclusions as to the effect of nondisclosure." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).

Defendants first argue that they were prejudiced by the government's failure to turn over statements made by Alexander Rodriguez, which they claim could have impeached cooperating witness Roberto Burbano. Burbano testified that on February 11, 2019, he was driving with Rodriguez and Abreu in a white Honda. At one point, Abreu exited the vehicle and met with two Asian men who

15

had stepped out of a white Mercedes sedan. Based on other evidence showing that Zhang drove a white Mercedes, the government argued in summation that this testimony linked Zhang with Abreu. On appeal, Defendants seize upon two apparent inconsistencies between Burbano's and Rodriguez's testimony. *First*, Burbano recounted that the Honda was from the late 1990s or early 2000s, while Rodriguez told the grand jury that "it *could* have been late 80s/early 90s." J. App'x at 1944 (emphasis added). *Second*, although Rodriguez recalled that Abreu met with a group of Asian men that day, he testified before the grand jury that Burbano was parking the car in a garage during this interaction, suggesting that Burbano could not have observed the meeting.

The district court concluded that Rodriguez's statements were not material, and we agree. For starters, Rodriguez largely corroborated Burbano's version of events, including the fact that Abreu met with a group of Asian men the day before the murder. And while Rodriguez's testimony might have provided additional fodder to cross Burbano on his version of events, we have explained that "[e]vidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime or where the likely impact on the witness's credibility would have undermined a critical

16

element of the prosecution's case." *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (citation and internal quotation marks omitted). That is not the case here. Far from being the only evidence linking Zhang to Abreu, Burbano's testimony was reinforced by a wealth of incriminating text messages from before and after the murder, phone records, surveillance video footage, and testimony from two co-conspirators, all of which constituted powerful evidence of Defendants' guilt. We therefore cannot say that the timely disclosure of Rodriguez's testimony would have compromised the government's case.

Defendants also argue that their rights were violated by the government's failure to turn over the grand-jury testimony of Special Agent Christopher Lin regarding the lighting conditions at the scene of the murder. At trial, the government presented testimony from You You and another co-conspirator – David Yu – that the lighting outside the nightclub was bright, which allowed Abreu and Zhang to identify Gu when he came outside. In contrast, Agent Lin had testified before the grand jury that based on his review of the evidence and his subsequent visit to the crime scene, he believed the lighting in the area was "pretty poor" and that "[i]t would be extremely difficult" to identify anyone emerging from the nightclub. J. App'x at 1954–55. Based on this statement,

Defendants argue that they could have called Agent Lin to undermine You You's and David Yu's testimony.

We have previously explained that "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998). Defendants here already had ample evidence to challenge You You's and David Yu's recollections of the lighting conditions outside the nightclub. For example, a transit officer who was at the crime scene at the time of the murder testified that the lighting conditions were "dismal, at best." J. App'x at 417. Likewise, the first responding police officer testified that it was "dark" in the area. Dist. Ct. Doc. No. 457 at 210. In any event, Abreu shot Gu at point-blank range and so had an opportunity to identify Gu before killing him. We thus conclude that Agent Lin's testimony – based solely on his after-the-fact observations – would have been cumulative of other evidence from witnesses who were at the scene of the murder and was not material.

**D.     Sentencing**

Finally, Defendants argue that the district court misconstrued the punishment clause of section 1958(a) and improperly imposed life sentences on them.   According to Defendants, section 1958(a) "grant[s] the district court discretion to impose life as a *maximum* term of imprisonment" while permitting the district court to sentence a defendant to a shorter term of imprisonment. Zhang Br. at 58.  But this interpretation contravenes the statute, which provides that "if death results," a defendant "*shall* be punished by death or life imprisonment, or shall be fined not more than $250,000, or both."   18 U.S.C. § 1958(a) (emphasis added).  The statute makes no mention of a maximum term of imprisonment, nor does it imply that a district court may impose a term of imprisonment less than life.  As the Supreme Court has repeatedly made clear, we must "resist reading words or elements into a statute that do not appear on its face."  *Dean v. United States*, 556 U.S. 568, 572 (2009) (internal quotation marks omitted).

Defendants also argue that "by its plain terms, [section 1958(a)] permits a sentence of death *or* life imprisonment *or* a fine *or* some combination of those options."  Zhang Br. at 57.  But we have already rejected this argument for a near-

19

identical punishment clause. Specifically, section 1959(a)(1) provides that a defendant who commits murder in aid of racketeering shall be punished "by death or life imprisonment, or a fine under this title, or both." In *United States v. James*, we explained that "[t]he notion that the statute contemplates the imposition of a fine without imprisonment cannot be reconciled with the extremely harsh punishments – death or life imprisonment – otherwise available." 239 F.3d 120, 126 (2d Cir. 2000). To avoid that absurd result, we held that section 1959(a)(1) "carries a mandatory minimum sentence of life in prison." *Id.* at 127. So too here. Indeed, under Defendants' reading of the statute, "it would be possible for a judge to impose essentially no punishment what[so]ever – a nominal fine and no prison time," and "[w]e see no basis for concluding that Congress intended [that] unlikely result" for a crime as serious as murder for hire. *Id.*

In response, Defendants urge us to rely on the rule of lenity. But the Supreme Court has explained time after time that the rule of lenity "applies only when a criminal statute contains a grievous ambiguity or uncertainty and only if, after seizing everything from which aid can be derived, [a] [c]ourt can make no more than a guess as to what Congress intended." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). Because no such grievous

ambiguity exists here, we have no reason to resort to the rule of lenity. Accordingly, we agree with the district court and hold that section 1958(a) imposes a mandatory minimum sentence of life imprisonment.

### III.   CONCLUSION

For all the foregoing reasons, we **AFFIRM** the judgment of the district court.