14-3739-cr (L)
*United States v. Babilonia*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term 2016

(Argued:    September 29, 2016        Decided:    April 17, 2017)

Docket Nos. 14-3739-cr, 15-651-cr, 15-1057-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

AISHA BABILONIA, RUBEN DAVIS, AKA Bloddy Ruben, AKA Fat Man,
AKA Fat Boy, ROGER KEY, AKA Sealed Defendant 1, AKA Luchie,

*Defendants-Appellants,*

RUBEN FERNANDEZ, AKA Pops, RICHARD PALMER, AKA P.O., AKA P.O.P., PEDRO
MARQUEZ, AKA Burns, AKA Bern, ANDREA ISAROON, AKA Chaz, DENNIS
FREDERICKS, AKA Ice, CLAYTON MOLLETTE, AKA Killer, AKA Clay, STEVEN
HERBERT, AKA Atta, SHUNDU DAVIS, AKA Davis Shundu, JAMES MARTIN, DEXTER
ERBY, AKA Addi, AKA Dida, YOUSSOUF DIOMADE, MOUSTAPHA GUEYE,
KHALILAH MATTOCKS, AKA Lils, JOSE CAPRIATA, GEORGE DAVIS, AKA Chee Chee,
KEITH PURVIS, AKA Kiz,

*Defendants.*[*]

_____

[*]     The Clerk of Court is respectfully directed to amend the official caption to
conform to the above.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

Before:

CHIN and CARNEY, *Circuit Judges*,
and COGAN, *District Judge*.*

Appeal from a judgment of the United States District Court for the Southern District of New York (Stein, *J.*) convicting defendant-appellant Roger Key, after a jury trial, of charges relating to drug trafficking and murder-for-hire. Key appeals his convictions on several grounds, including the sufficiency of the evidence as to the pecuniary value element of conspiracy to commit murder-for-hire and the propriety of admitting evidence from warrantless searches of his car and apartment.

AFFIRMED.

MARGARET GARNETT, Assistant United States Attorney (Abigail Kurland, Assistant United States Attorney, *on the brief*), *for* Joon H. Kim, Acting United States Attorney for

---

* Judge Brian M. Cogan of the United States District Court for the Eastern District of New York, sitting by designation.

the Southern District of New York, New York, New York, *for Appellee*.

ROBERT CALIENDO (Marc Fernich, *on the brief*), Law Office of Marc Fernich, New York, New York, *for Defendant-Appellant Roger Key*.

CHIN, *Circuit Judge*:

Defendant-appellant Roger Key appeals from a judgment of the district court (Stein, *J.*) convicting him of, *inter alia*, conspiracy to commit murder-for-hire and several drug- and firearm-related offenses. Key principally challenges the sufficiency of the evidence supporting his conviction for participating in the murder-for-hire conspiracy targeting Terry Harrison and the admission at trial of evidence seized during an August 6, 2012 car stop and search (the "Car Stop") and a September 19, 2012 search of Key's apartment (the "Apartment Search"). Because we conclude that the evidence offered at trial to prove the pecuniary value element of Key's conviction for conspiracy to commit murder-for-hire was sufficient to support the guilty verdict and that the

3

challenged searches and seizures did not violate the Fourth Amendment, we affirm the judgment of the district court.[1]

## BACKGROUND

### I.  The Facts

Key's appeal relates to charges arising out of his involvement in a Bronx- and Manhattan-based drug trafficking operation and the murder-for-hire plots targeting Terry Harrison, a rival drug dealer, and Matthew Allen, the abusive boyfriend of defendant-appellant Aisha Babilonia.[2]  The following facts, generally undisputed, are summarized from the testimony at the suppression hearing, the district court's factual findings following the suppression hearing, and the transcript of the trial below.  With respect to the district court's factual findings, we review for clear error.  *United States v. Hussain*, 835 F.3d 307, 313 (2d Cir. 2016).  With respect to the evidence presented at trial, we construe the facts "in the light most favorable to the government, crediting any inferences that the

---

[1]     We address in an accompanying summary order filed today the appeals of Aisha Babilonia and Ruben Davis, Key's co-defendants.

[2]     Key appeals his convictions on charges relating to Allen's murder only insofar as they were the product of evidence seized during the Car Stop and Apartment Search.  Accordingly, the details of the plan to murder Allen are not recounted.

jury might have drawn in its favor." *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016).

### A. Background

In 2010, Key was released from prison after serving several years on state manslaughter and federal narcotics convictions. Upon his release, and until his arrest in connection with the instant case in September 2012, Key distributed millions of dollars' worth of cocaine to drug organizations in the Bronx and upper Manhattan. One of Key's biggest customers was defendant-appellant Ruben Davis, who led a Harlem-based drug trafficking organization. Key's distribution operation used multiple stash houses around the Bronx and upper Manhattan and guns to protect their territory and attack rival dealers. Key also oversaw a group of young men who sold crack cocaine for him around the apartment building located at 321 East 153rd Street ("321").

### B. The Murder of Terry Harrison

Terry Harrison, also known as "T-Money," was another Bronx-based drug dealer and a rival of Key. Key and his associates were involved in an ongoing, violent dispute with Harrison and a local street gang, "GFC," that sold drugs for him.

In the summer of 2010, Matthew Davis ("Matt"), an associate of Key, approached Kevin Wilson about committing a murder.[3] Wilson and Matt knew each other, and Wilson was aware that Matt had recently returned home from prison. While Wilson was leaving his child's mother's house, a minivan pulled up, with Matt inside. Matt told Wilson to get into the van. Wilson did so; inside were Matt, the driver, and one or two people in the back.

After exchanging pleasantries, Matt told Wilson that he needed Wilson to "dress someone up" for him. Tr. 907. Matt explained that he needed Wilson to kill someone for him, "like now." Tr. 907. One of the passengers in the back put a gun to Wilson's head, while Matt instructed Wilson that "you gonna do it or we gonna kill you." Tr. 907. Wilson agreed to commit the murder.[4] He gave Matt his phone number, and Matt said he would call Wilson. Wilson did not call the police or ask anyone else for help after his conversation with Matt.

Matt called Wilson the next day and then went to meet him. They took a cab to 321, which Matt referred to as "Headquarters." There, Matt introduced Wilson to Kyle Harris, or "Beans," another individual who sold drugs

---

[3]      Matthew Davis is not related to defendant-appellant Ruben Davis.

[4]      Despite the threat, Wilson testified that he agreed to commit the murder voluntarily.

for Key. After Beans left, Matt introduced Wilson to Keith Burges, or "Cuzzo," and the three of them walked into the lobby of 321. Beans returned to the lobby and retrieved two handguns from a staircase. He banged on a mailbox with his fist to open it and put the guns inside.

Wilson spent three or four days with Matt and his associates at 321. During that time, Matt told Wilson that there had been a change of plans; Cuzzo would be the primary shooter, and Wilson would be the backup. Wilson understood this to mean he would be responsible for shooting at anyone who shot at Cuzzo. At no point prior to the murder did Wilson know the target's identity; he learned Harrison's name after he was arrested.

Wilson never asked Matt why Matt wanted him to kill someone, who the target was, or what he would get in exchange. Wilson hoped to get money out of his agreement to kill Harrison, but no one discussed a specific dollar amount for Wilson's compensation prior to the murder. He hoped to become part of a team, with "people by [his] side." Tr. 919. He further testified that "Matt was basically telling me they was going to hold me down, that I was going to be good." Tr. 918. Wilson understood this to mean that Matt and his

7

group would "hold me down, give me money, look out for me, watch over me," and that this meant he would be "accepted with them." Tr. 918.

A few days prior to the murder, Beans gave Wilson and Cuzzo the guns from the mailbox in the lobby of 321. Wilson received a silver .380 caliber gun and Cuzzo a silver revolver. Wilson and Cuzzo left the building and walked through the housing projects on Courtlandt Avenue. Wilson was carrying the gun in his waistband. Wilson did not know whom they were looking for, so he just followed Cuzzo. He understood that they were looking for the target of the murder plot. As they walked, a police car drove down the opposite side of the block. The car stopped and the officers jumped out. Wilson and Cuzzo, still carrying the guns from Beans, ran as the officers chased them. At some point, Wilson jumped over a gate and the gun fell to the ground. He continued to run. He had lost Cuzzo at this point. After waiting a couple of minutes, he returned to Headquarters and told the group, which included Joseph Tarean, or "T," and a man known as "E-Wop," that he had dropped the gun.

Matt called Wilson and told him that he would have to pay for the gun if he did not find it. Wilson left the building and ran into T, who told him that the area was clear of police activity. Wilson retraced his steps and found the

8

gun buried in the grass.  He picked it up and returned to 321, where Matt, T, Beans, and others were hanging out.  Key arrived and began talking to Matt, who then introduced Key to Wilson.

Two or three days later, Wilson got a phone call from Matt, asking him to come up to Courtlandt Avenue.  Wilson called Matt once he had arrived, and Matt told Wilson he was across the street in a van.  Wilson got into the van. Later, Key pulled up in a black Jeep.  Key and Matt began talking through their rolled-down windows.  Wilson could not understand what they were saying and thought that they were speaking in code.  They spoke for a few minutes.

Wilson left the van to go to the store.  When Wilson got back to the van, Matt drove him around the block and told Wilson to do what he had been asked to do initially.  Wilson understood this to mean that Matt was asking him kill someone.  Wilson agreed.  Matt handed Wilson a silver revolver from a concealed compartment in the roof of the van.  Matt described the target to Wilson as a black man with braids and let Wilson out on the sidewalk.  Wilson looked in the barbershop where Matt told him the target would be but did not see anyone other than the barbers.  Matt called Wilson numerous times to see

9

what was going on. During one of these calls, Wilson realized that he was at the wrong barbershop and proceeded up the block to another barbershop.

Matt provided Wilson with additional details regarding Harrison's appearance, and Wilson spotted Harrison walking towards him. Wilson ducked into a store, and Harrison and his friends entered the store behind Wilson. Wilson left the store and took another call from Matt, who expressed frustration that the shooting had not yet occurred. Matt told Wilson to "do what [he] got to do" and then run around the corner to Third Avenue, where Matt would pick him up in the minivan. Tr. 941. Wilson hid between two cars and moved the gun from his waistband to the front pocket of his sweatshirt. He then walked out from behind the cars towards Harrison and shot him three times. Harrison later died from the gunshot wounds.

Wilson turned and ran to Third Avenue where he jumped into the van with Matt, Beans, and another individual. Wilson gave his sweatshirt and the gun to Beans and changed into another shirt that Matt gave him. Wilson told Matt he was not sure if he had killed Harrison. Matt let Wilson out of the minivan and told him to shower and relax.

Later that night, Matt called Wilson and told him it was "pay day." Tr. 946. Wilson believed that he was going to get paid for the murder. Wilson went to Matt's house, where Matt was standing outside the van with Beans, Cuzzo, and Jamal Brooks. They all got into the van and drove to Manhattan. Once they reached their destination, Wilson and Matt got out and stopped at a grocery store. Key was standing across the street from the store, and they crossed over to talk to him. Key thanked Wilson for "handling that situation for him," which Wilson understood to mean shooting Harrison. Tr. 948. Key then handed Wilson $1,000 in cash. After paying Wilson, Key appeared to be in high spirits and told Wilson "that's how you get money." Tr. 949.

## C. *The Car Stop*

Drug Enforcement Administration ("DEA") Special Agent John Livanis, assigned to the New York Field Division Strike Force, was involved in an ongoing investigation of Key that began in June 2012. Based on information provided by a confidential informant, Livanis and his team began conducting surveillance of Key.[5]

---

[5] Livanis and his team did not know Key's identity at the time he first became a target of the investigation. After the NYPD traced a license plate number of a Nissan Maxima driven by Key (FBZ 3330), which had been provided to Livanis by a confidential informant, Livanis learned that Key was being investigated for drug-

11

In June 2012, Livanis observed a man, later identified as Key, leave a store with a large shopping bag, after the informant saw the man purchase a kilo press, a device used to package large quantities of drugs. On August 3, 2012, three days before the Car Stop, Livanis observed the same man leave 3427 Bruckner Boulevard, an apartment building in the Bronx, with a small gift bag and head to a body shop in Mount Vernon, New York, in the Nissan Maxima previously identified by the informant. The man brought the gift bag, which Livanis believed to contain either drugs or money, into the body shop and left without it.

On August 6, 2012, the day of the Car Stop, Livanis, New York State Police Senior Investigator Frederick Cabbell, and a team of agents resumed surveillance, looking for the Maxima. The agents saw a man park a Toyota Sienna, which had no front license plate, across from 3427 Bruckner Boulevard. Livanis recognized the man from his previous surveillance operations but did not convey his suspicion to anyone else on the team. The man got out of the Sienna and looked up and down the block repeatedly, even though there was no car traffic on the street. Cabbell found the man's behavior "suspicious," App. 251,

related activity and murder-for-hire, and that Key was connected to Davis, who was also the subject of an ongoing narcotics investigation.

12

and based on his experience, he believed that the man was checking for police or other observers in the area.

After crossing the street, the man entered the building. He reappeared within minutes, holding a green plastic bag with a weighted, brick-shaped object inside. He walked back across the street quickly and got into the driver's seat of the Sienna. Based on their observations and experience, both Livanis and Cabbell suspected that the bag contained either drugs or drug proceeds.

Cabbell then instructed the team, comprised of agents in several unmarked vehicles, to follow the Sienna.[6] Livanis stayed back at the apartment building and listened to the communications on his radio. Cabbell also followed the Sienna and saw the driver use a cell phone. Cabbell instructed the team to make a traffic stop. Special Agents Kuzman and Lorens turned on their lights and sirens and, using their PA system, instructed the Sienna to pull over. The car slowed down briefly but did not stop, and eventually took off onto the highway. Kuzman repeatedly called out for the car to pull over while it weaved in and out of traffic on the northbound Bruckner Expressway at high speeds. The driver of

---

[6]     Although the district court found that only Livanis instructed the team to pursue the Sienna, both Livanis and Cabbell testified that they did so.

the Sienna remained on his phone, and Kuzman informed the team that the driver was failing to yield. The surveillance team continued in pursuit for five to eight minutes. Finally, the car took the Stillwell Avenue exit off the Expressway and came to a stop in a nearby intersection.

Cabbell drew his weapon and ran towards the Sienna screaming "police" with his badge visible; other members of the team did the same. Kuzman got out of his car and asked the driver to show his hands, but the driver continued to use his cell phone. Cabbell holstered his weapon and removed the driver from the vehicle. The cell phone was still inside the car.

Cabbell saw the green plastic bag between the two front seats. The bag was wrapped tightly such that the rectangular shape of its contents was apparent. Cabbell removed and opened the bag to find $10,000 in cash bundled with rubber bands inside.

The driver was handcuffed and taken to the 45th Precinct. Cabbell stayed behind with the car and moved it out of traffic. He then conducted a "cursory search" of the car. App. 243. Cabbell found additional cell phones, New York license plate FBZ 3330, receipts for several additional cell phones, miscellaneous papers, and two Pelican cases with instructions for a GPS device.

14

At that time, he recognized the license plate from his investigation as belonging to Key. In an effort not to raise Key's suspicions about the broader investigation, the agents decided not to proceed with prosecution. They also opted not to seize any evidence from the car other than the green bag. Cabbell returned to the precinct and told Key that his money had been seized, but that he would get his car keys back.

### D. *The Apartment Search*

On the morning of September 19, 2012, Key was arrested by Federal Bureau of Investigations ("FBI") Agent Brendan Kenney and a team of 12 to 15 law enforcement personnel in an apartment at 1604 Metropolitan Avenue in the Bronx. Kenney and another agent knocked on the apartment door and announced themselves. Key answered the door in boxer shorts and an undershirt, holding a cell phone. Kenney and another agent took the cell phone from Key, pulled him into the hallway, and handcuffed him. After the agents made sure no one else was in the apartment, they brought Key back inside to get dressed.

When Kenney brought Key into the living room, Kenney noticed "a number of cell phones" on the table. App. 245.[7] At that time, the FBI was investigating Key for narcotics trafficking and a murder-for-hire conspiracy that involved cell phones. Kenney was also aware of a wiretap investigation into Key's drug trafficking activities that involved cell phones. Kenney asked Key if there were firearms or drugs in the apartment; Key said that there were not and gave Kenney verbal consent to search the apartment for firearms and drugs. At no point did Kenney ask Key to complete a consent form.

Kenney went into the bedroom to get clothes for Key. He picked up a pair of jeans and checked them for contraband. He found car keys for a Toyota and a Bentley, as well as cash in the jeans' pockets. Kenney knew from the ongoing investigation that Key operated a Toyota Sienna and a Bentley. As the agents went through the apartment, they also recovered cell phones, an iPad, and an address book. The search lasted approximately 15 minutes. Key was seated in the living room for the duration of the search and did not ask the agents to stop at any point.

---

[7] At oral argument, defense counsel and the government agreed that four or five cell phones were recovered.

After the search was completed, Kenney and an NYPD detective transported Key to the FBI's office at 26 Federal Plaza in Manhattan. Kenney provided Key with a property receipt for the items that were seized.

## II.   *The Proceedings Below*

In a superseding indictment filed February 25, 2014, Key was charged with narcotics conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); use, carrying, and possession of firearms in connection with the narcotics conspiracy in violation of 18 U.S.C. §§ 924 and 2 (Count Two); conspiracy to commit murder-for-hire and attempted murder-for-hire of Matthew Allen in violation of 18 U.S.C. §§ 1958 and 2 (Counts Three and Four); use, carrying, and possessing of a firearm in connection with the Allen murder-for-hire conspiracy in violation of 18 U.S.C. §§ 924 and 2 (Count Five); conspiracy to commit murder-for-hire and murder-for-hire of Terry Harrison in violation of 18 U.S.C. §§ 1958 and 2 (Counts Six and Seven); murder in connection with the narcotics conspiracy in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 (Count Eight); and aiding and abetting the use of a firearm to commit murder in connection with the Harrison murder-for-hire charges in violation of 18 U.S.C. §§ 924(j)(1) and 2 (Count Nine).

17

Before trial, Key moved to suppress physical evidence recovered from the Car Stop and the Apartment Search. After a two-day hearing, the district court denied Key's suppression motions, ruling from the bench. The court credited the testimony of the law enforcement officers and denied suppression, ruling that (1) the Car Stop was supported by probable cause to believe that a crime had occurred, (2) the automobile exception justified the search of the car for the green plastic bag, and (3) the evidence, not ultimately seized, from the rear of the car would have been discovered in a permissible inventory search. Regarding the Apartment Search, the court ruled that, based on his training, experience, and knowledge of the investigation, Kenney had probable cause to believe that the electronic items and address book were evidence of criminal activity and thus was justified in seizing them under the plain view doctrine.

Key's trial began on March 17, 2014 and lasted approximately two weeks. The government called approximately 25 witnesses, including Wilson, the man who killed Harrison, and introduced wiretap records and physical records, including narcotics paraphernalia, a firearm, a photograph of items seized during the Car Stop, cell site records, phone records, Department of Motor

Vehicles records, and bank records. The district court denied Key's motions for a directed verdict at the close of the government's case and at the end of the trial.

On April 2, 2014, the jury found Key guilty on Counts One through Six -- the drug trafficking charges, the Allen murder-for-hire charges, and conspiracy to commit the Harrison murder-for-hire -- and not guilty on Counts Seven through Nine -- the substantive murder, murder-for-hire, and firearm charges relating to the Harrison murder.

On March 27, 2015, Judge Stein sentenced Key principally to life imprisonment on Count One, a concurrent ten years' imprisonment on Counts Three, Four, and Six, a consecutive five years' imprisonment on Count Two, and a consecutive 25 years' imprisonment on Count Five, for a total sentence of life imprisonment plus 30 years.

This appeal followed.

*DISCUSSION*

Two issues are presented: (1) the sufficiency of the evidence as to the pecuniary value element of murder-for-hire with respect to Count Six, and (2)

the legality of the Car Stop and the Apartment Search.[8]  We address each issue in turn.

## I.    *The Sufficiency of the Evidence*

In considering the sufficiency of the evidence on appeal of a conviction, we "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Rosemond*, 841 F.3d at 113 (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  We must affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (quoting *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016)).

### A.    *Applicable Law*

The murder-for-hire statute prohibits traveling in interstate or foreign commerce, or using a facility of interstate commerce, with intent that a murder "take place in exchange for the provision of, or a promise to pay, anything of pecuniary value."  *United States v. Frampton*, 382 F.3d 213, 218 (2d Cir. 2004).  Section 1958 of Title 18 of the United States Code provides:

---

[8]    Key also argues that his drug-related convictions were impermissibly tainted by prejudicial spillover from the murder-for-hire convictions.  In light of our affirmance of the murder-for-hire convictions, this argument is foreclosed.

Whoever travels in or causes another . . . to travel in interstate or foreign commerce, or uses or causes another . . . to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be . . . imprisoned for not more than ten years . . . ; and if personal injury results, shall be . . . imprisoned for not more than twenty years . . . ; and if death results, shall be punished by death or life imprisonment . . . .

18 U.S.C. § 1958(a).

As the wording of the statute makes clear, there must be the intent that a murder be committed as "consideration" for the payment of, or promise or agreement to pay, something of "pecuniary value." *Id.* We have held that "there must be a 'quid-pro-quo (or at least the promise of such) between the parties to the transaction.'" *United States v. Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008) (quoting *United States v. Hernandez,* 141 F.3d 1042, 1057 (11th Cir. 1998)). Not all intended exchanges, however, satisfy the statute's "pecuniary value" requirement. The mere fact that the intended exchange between the solicitor of the murder and the solicited murderer "*could* inure to the economic benefit of the latter is insufficient." *Frampton*, 382 F.3d at 219. For the exchange to be "pecuniary," the intended consideration must be "something the 'primary significance' of which lay in its 'economic advantage.'" *Id.* (quoting 18 U.S.C.

21

§ 1958(b)(1)). Accordingly, we have held that the promise of a favor is insufficient to sustain a murder-for-hire conviction under § 1958 absent "evidence suggesting that either party had an understanding as to the form that it would actually take." *Id.*[9]

To sustain a conviction for conspiracy, the government must prove that the defendant "knowingly joined and participated in [the conspiracy]" and "possessed the specific intent to commit the offense that was the object of the conspiracy." *United States v. Valle*, 807 F.3d 508, 515-16 (2d Cir. 2015). The government need not prove that the conspirators "have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004). "[P]roof of a tacit understanding will suffice." *United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992). A defendant's participation in a conspiracy can be proven by circumstantial evidence. *See United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002).

---

[9] A number of circuits have held that "§ 1958 does not require the existence of an actual murder-for-hire agreement." *United States v. Dvorkin*, 799 F.3d 867, 875 (7th Cir. 2015) (collecting cases). The Seventh Circuit has noted that our circuit's precedents, specifically *Hardwick* and *Frampton*, contain language that "could be construed as inconsistent" with that position. *Id.* at 877 n.21 (citing *Hardwick*, 523 F.3d at 99, and *Frampton*, 382 F.3d at 217). We need not address this issue, as here there was sufficient evidence to show that all three parties to the murder-for-hire scheme had a mutual understanding that Wilson would be paid for his work.

## B. *Application*

The question is whether a reasonable jury could have found that Key and others agreed to commission Harrison's murder in exchange for the provision of, or a promise to pay, something of pecuniary value. We answer in the affirmative and uphold Key's conviction.

Key argues that Wilson's vague testimony regarding what he was to receive in exchange for Harrison's murder shows only that Wilson was expecting an unspecified favor, which cannot support a finding of pecuniary value. In *Frampton*, the only evidence of consideration for the agreement to commit murder was a co-conspirator's testimony that the shooter would receive an unspecified "favor," later clarified as "[a]nything he need." *Frampton*, 382 F.3d at 218. We rejected the government's argument that the jury could infer that the "favor" carried inherent economic value and, thus, satisfied the consideration requirement. *Id.* at 218-19.

Here, unlike in *Frampton*, the record contains evidence from which the jury could find that the parties had an understanding that Wilson would be paid to murder Harrison. *Cf. id.* at 219. Wilson's descriptions of his interactions with Matt make clear that more than an undefined favor was promised. Wilson

23

and Matt discussed the shooting over the course of several days, including what Wilson would receive in return for the murder. Although he was not directly involved in the conversations, Key was present, and a reasonable jury could have inferred that Matt was receiving instructions from Key. Unlike in *Frampton*, where there was no indication that either party believed that money would be exchanged, Wilson testified that he understood Davis's representation that he would "hold [Wilson] down" to mean, among other things, that Matt and Key's other associates would take care of Wilson financially. Indeed, Wilson testified that he understood the group would "hold me down, *give me money*, look out for me." Tr. 918 (emphasis added).

Key's conduct after the murder also sheds light on the arrangement between Matt and Wilson. Shortly after the shooting, Matt told Wilson that it was "pay day." Matt then brought him to Key, who handed Wilson $1,000 and thanked him for "handling that situation." Tr. 946, 948. Hence, Matt, Wilson, and Key all acted as if they understood that Wilson would be paid for the deed.

For the substantive murder-for-hire crime, we assess whether the pecuniary value element was met when the agreement was made. *Frampton*, 382 F.3d at 219. Here, Key and his co-conspirators' post-agreement course of conduct

24

is circumstantial evidence of Key's specific intent at the time Wilson was hired to provide monetary compensation for the murder's completion. In particular, Key paid Wilson after the murder. *See United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) ("Circumstantial evidence may be used to prove specific intent to commit the object of a conspiracy. . . ."). Thus, drawing all inferences in the government's favor, a rational jury could conclude that, at the time of the initial solicitation, Wilson and Matt agreed that the murder would be carried out in exchange for financial compensation to be provided by Key.

Key contends that the post-murder payment is insufficient to establish the pecuniary value element, citing, *inter alia*, *United States v. Chong*, 419 F.3d 1076 (9th Cir. 2005). In *Chong*, the Ninth Circuit held that the jury did not have adequate evidence to find that $100 given to a hitman after a murder constituted compensation for the murder-for-hire in the absence of an overt agreement or understanding between the hitman and the defendant (or the defendant's co-conspirators). *Chong*, 419 F.3d at 1082. At the time of the agreement, the hitman was aware only that he and other volunteers would be traveling to Boston from San Francisco and that they would be bringing guns to complete an unspecified task. *Id.* at 1083. It was not until the volunteers reached

Boston that they were told, right before the murder took place, that the job was to kill someone. *Id.* The court concluded that the evidence showed only that the shooter "volunteered for a dangerous assignment and wound up getting some walking-around money." *Id.* On those facts, the Ninth Circuit held that the jury had insufficient evidence to find that the shooter agreed to travel to Boston to commit a murder in exchange for something of pecuniary value offered by the defendant or his co-conspirators. *Id.* at 1083-84.[10]

Here, Wilson knew exactly what he was being asked to do when he agreed to assist Matt. The evidence at trial established that Matt discussed with Wilson what Wilson would receive for assisting with the murder of Harrison, although it is hard to divine the precise nature of that consideration from only Wilson's recollection of their interactions prior to the murder. Nonetheless, a jury could reasonably find that when Matt told Wilson that he would "be good,"

---

[10]    In further support of his argument, Key cites the decision of the district court (Forrest, *J.*) on Matthew Davis's Rule 29 motion in his criminal case. *See United States v. Davis*, 103 F. Supp. 3d 396 (S.D.N.Y. 2015). In holding that no rational juror could find that the pecuniary value element was met as to Matt, the district court noted that "[i]t is . . . legally insufficient that [Matt] Davis may have held a unilateral belief that the likely form of compensation was money" without any indication of Wilson's understanding. *Davis*, 103 F. Supp. 3d at 404. Here, of course, there was a different record, including evidence of Wilson's understanding of the bargained-for exchange, as well as a jury verdict against Key. Accordingly, the disposition of Matt's case in the district court carries little weight.

Matt was promising financial compensation, particularly in light of Wilson's post-murder interactions with Matt and Key.

Finally, in addition to his arguments regarding the pecuniary value element, Key argues that there is no evidence that he knew the murder had been planned, let alone who would commit the murder or that someone would be paid for its commission. We are not persuaded. Wilson's testimony about his interactions with Matt and the other members of Key's crew, when considered with his testimony as a whole, provided a basis for the jury to conclude that Key not only knowingly participated in the murder-for-hire conspiracy, but also was the driving force behind the plan. After Matt asked Wilson to commit the murder, Wilson spent the next few days in the company of Matt, Beans, Cuzzo, and others. Matt and Beans provided Wilson with guns and instructed him on the plans for the murder. As Wilson sat in Matt's minivan just before the murder, Key pulled up in his car and had a conversation with Matt in a code that Wilson could not understand. When Wilson was trying to find Harrison, he saw T and E-Wop positioned as lookouts on the street. After the shooting, Matt and Beans took Wilson's clothes and gun from him. Within hours, Matt called Wilson

27

to tell him that it was "pay day." Tr. 946. Then, Wilson, Matt, Beans, Cuzzo, and Brooks all drove to Manhattan where they met Key, who then paid Wilson.

In addition to the evidence regarding the planning and execution of Harrison's murder, the government introduced evidence of Key's role as a high-level drug supplier and his relationship with Matt and other young men who acted at his direction. The testimony at trial established that Key supplied large quantities of cocaine to drug organizations run by co-defendants Ruben Davis and Jermaine Smalls. Two witnesses testified that Matt sold drugs for Key, and one witness testified that Matt stored drugs that Key had supplied to Smalls in his grandmother's house. One cooperator testified that Key stopped giving Matt drugs to sell, or "work," when Key thought that Matt was selling too slowly. Tr. 578. A member of Smalls's crew testified that Smalls was scared that Key would retaliate against him through his associates, who Smalls called "wolves," due to an outstanding debt. Tr. 572. The jury also heard from a member of Ruben Davis's organization, who testified that Key discussed having a mutual associate killed, stating that he did not tolerate disrespect and had young men who "will do anything" for him. Tr. 1410.

28

The government also presented evidence from which the jury could infer that Key conspired with others to have Harrison killed because of a longstanding dispute over drug selling territory. Bernard Folks, who sold drugs for Harrison, testified that Harrison supplied his crew with guns to protect themselves from and attack other local gangs who sold in the same territory, including the crew that sold drugs out of 321. Jiya Canady, who was involved in the murder-for-hire of Matthew Allen, testified about a conversation with Key, during which Key told Canady that he had a rivalry with other crews over territory in the Bronx and had to "lay somebody down." Tr. 113. Canady further testified that Key reported that the other drug dealers in the housing projects "fell in line" and "accepted his . . . control" after the murder. Tr. 114.

Accordingly, because a rational jury could have inferred that Key participated in the conspiracy to murder Harrison and specifically intended that Wilson would be paid in exchange for committing the murder, we conclude that there was sufficient evidence to satisfy the pecuniary value element of the murder-for-hire analysis.

## II. The Searches

We review a district court's ruling on a suppression motion for clear error as to factual findings, "giving special deference to findings that are based on determinations of witness credibility," and *de novo* as to questions of law. *Hussain*, 835 F.3d at 312-13 (quoting *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009)). In so doing, we conclude that Key's motion was properly denied and the evidence from the challenged searches was properly admitted.

### A. The Car Stop

Key argues that Investigator Cabbell's warrantless search of his car was unconstitutional because (1) the search of the passenger cab was not justifiable either as a search incident to arrest or under the automobile exception, and (2) the evidence observed in the rear storage area of the car would not have been acquired lawfully had the unlawful search not occurred.

#### 1. Applicable Law

Warrantless searches are "*per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The "automobile exception" permits law enforcement officers to search without a warrant "a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *Navas*, 597 F.3d at 497 (citing *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996) (per curiam)). If the exception applies, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

"[P]robable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Gaskin*, 364 F.3d 438, 456-57 (2d Cir. 2004) (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)) (internal quotation marks omitted). Of course, probable cause is a dynamic concept, and we have recognized that a law enforcement officer's experience and training may permit the officer to "discern probable cause from facts and circumstances where a layman might not." *Id.* at 457. Furthermore, under the collective knowledge doctrine, even if the law enforcement officer actually conducting the search lacks

31

the relevant facts to support probable cause, the search may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts. *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001); *see also Hussain*, 835 F.3d at 316 n.8.

In addition, law enforcement officers taking a vehicle into custody after an arrest may search it and inventory its contents "without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008). Thus, after a lawful arrest (for example, after a traffic violation) where a search incident to arrest is not justified, evidence recovered from an immediately ensuing search may be admissible nevertheless "if the contents would inevitably have been discovered in a permissible inventory search." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993).

**2. Application**

Here, there was ample evidence for the agents to believe that Key's vehicle contained contraband. Cabbell's testimony, credited by the district court, established that he was conducting surveillance as part of a larger drug trafficking investigation when he saw a man emerge from a minivan without a

front license plate and look up and down the block several times over a period of minutes, even though there was no street traffic at the time. Cabbell then saw the man enter an apartment building and return minutes later with a green plastic bag weighed down by a brick-shaped object, now hurrying back to the car. At that time, Cabbell suspected that the package in the bag contained drugs or drug-related proceeds. But there was more.

After Cabbell instructed his team to stop Key's car, Key failed to pull over and continued driving at high speeds with the agents in pursuit for five to eight minutes. Key's initial efforts to escape surely provided the agents additional reason to believe that Key had something to hide. We have long recognized flight as an appropriate factor supporting a finding of probable cause to search a vehicle after it is stopped. *See United States v. Christophe*, 470 F.2d 865, 868-69 (2d Cir. 1972); *see also United States v. Oliver*, 363 F.3d 1061, 1068-69 (10th Cir. 2004). The agents could have reasonably concluded that Key was transporting drugs.

Key also contests the admission of testimony regarding the evidence observed in the back of his car. We agree with the government that the evidence

in the back of the car would have been discovered in an inventory search given

Key's arrest.

As Key acknowledges, the inevitable discovery doctrine requires the

district court to assess, "viewing affairs as they existed at the instant before the

unlawful search occurred, what would have happened had the unlawful search

never occurred." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (emphasis

omitted) (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)).  After

Cabbell recovered the green plastic bag from the front of the car, Key was

handcuffed and transported to the precinct.  At that point, Key's car was still

sitting in the middle of an active roadway.  Cabbell then moved the car out of the

line of traffic before conducting a "cursory search" of the rest of the vehicle.

Gov't App. 232.  After Key was under arrest and had been taken away from the

scene, Cabbell was entitled to conduct an inventory search before taking the

vehicle into police custody as part of routine procedure.  *See Lopez*, 547 F.3d at

369-70.  As a result, discovery of the evidence in the back of the car was

inevitable.  Key's challenge to the evidence seized from the Car Stop fails.

34

## B. *The Apartment Search*

Key also argues that the district court erred in concluding that Agent Kenney was justified during the apartment search in seizing cell phones, an iPad, and an address book as evidence of possible criminal activity under the plain view doctrine because any incriminating character of such items cannot be immediately discerned.

### 1. Applicable Law

The "plain view" exception to the Fourth Amendment's warrant requirement is well-established. *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014). Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is "lawfully in a position from which [the officer] view[s] an object," (2) the object's "incriminating character is immediately apparent," and (3) the officer has "a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). When an officer, during a justified intrusion, encounters incriminating evidence, "[t]he doctrine serves to supplement the prior justification -- whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for

35

being present unconnected with a search directed against the accused -- and permits the warrantless seizure." *Horton v. California*, 496 U.S. 128, 135-36 (1990).

### 2. Application

Key does not challenge the officers' right to be present in his apartment at the time of the challenged seizure or to access the seized objects. Instead, Key argues that the ubiquity of cell phones and the fact that he was arrested in his home preclude a finding that the incriminating character of the phones and tablet was immediately apparent. We disagree.

Research suggests that virtually every adult in the United States owns a cell phone, "which [is] now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude [it was] an important feature of human anatomy." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014); *see generally Mobile Phone Ownership*, Pew Research Center (January 11, 2017), http://www.pewinternet.org/chart/mobile-phone-ownership/. As Key notes, it is increasingly common for individuals to own more than one mobile phone: an employer might require a separate device for security reasons, an individual might decide to upgrade to a newer model, or a parent might purchase a phone

for a child. As a result, we are mindful that the presence alone of a cell phone, or even several cell phones, in a home is not inherently incriminating.

We nevertheless disagree with Key that Kenney had no reason to believe that the phones in the apartment would provide evidence of criminality, and we conclude that Kenney was justified in seizing the phones and iPad under the plain view doctrine. At the time of Key's arrest, Kenney had been investigating him for months. The investigation had revealed that the murder-for-hire conspiracies involved the use of multiple cell phones. A separate wiretap investigation that Kenney was aware of showed that Key and his co-conspirators used cell phones to conduct drug-related activity. Kenney had analyzed Key's use of numerous cell phones in connection with his purported criminal activity. Finally, in Kenney's experience, he had found that address books usually contained contact information for associates.

Based on this record, we are not troubled by the agents' warrantless seizure of Key's cell phones, iPad, and address book, particularly as the agents did not search the electronic devices until after a warrant had been obtained. Seizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence. *See, e.g.,*

37

*United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 89 (2d Cir. 2002) (upholding warrantless seizure of money orders under plain view doctrine because denominations of money orders supported probable cause that they were obtained to evade reporting requirements); *United States v. Cushnie*, No. 14 CR 119 (PGG), 2014 WL 7447149, at *12 (S.D.N.Y. Dec. 31, 2014) (upholding warrantless seizure of defendant's cell phone, keys, and wallet where marshals had reason to believe they would provide evidence of defendant's interstate travel and failure to register as a sex offender); *United States v. Delva*, 13 F. Supp. 3d 269, 276 (S.D.N.Y. 2014) ("Courts have routinely denied motions to suppress the seizure of cell phones, in the context of narcotics conspiracies, based on knowledge that the phones may contain contacts and other evidence of a crime."); *United States v. Meregildo*, No. 11 CR 576 (WHP), 2012 WL 4378047, at *4 (S.D.N.Y. Sept. 24, 2012) ("Because law enforcement suspected [defendant's] involvement in racketeering and narcotics conspiracies -- whose members used cellular phones and social media to facilitate their criminal acts -- the iPhone and iPod Touch . . . were immediately identifiable as evidence of criminal conduct."); *United States v. Reyes*, No. 3:06CR120 (SRU), 2007 WL 419636, at *6 (D. Conn. Jan. 30, 2007) ("[T]he cellular telephones plainly fall within the standard. It was

immediately apparent to [the] trained DEA agent with over ten years of law enforcement experience, that cellular telephones contain caller logs, text messages, phone books and other information that would be highly relevant to a drug prosecution and would be very likely connected with criminal activity.").

The district court was entitled to credit Kenney's testimony, which established probable cause to believe that the items in question would contain evidence of Key's alleged criminal activity. *See United States v. Escobar*, 805 F.2d 68, 72 (2d Cir. 1986) ("[The agent's] knowledge of the relationship between the evidence seized and the . . . conspiracy, gleaned through months of investigation, gave him probable cause to believe that the [items seized] were evidence of a crime."); *United States v. Gamble*, 388 F.3d 74, 77 (2d Cir. 2004) (per curiam). The district court thus appropriately concluded that the incriminating character of the items seized was readily apparent to Kenney when he saw them in Key's apartment.

Accordingly, we affirm the district court's decision to deny Key's suppression motions and admit testimony regarding the evidence observed during the Car Stop, as well as evidence seized from the Car Stop and Apartment Search.

## *CONCLUSION*

For the reasons stated above, the judgment of the district court is

**AFFIRMED**.