23-6755-cr
*United States v. Kurland*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of December, two thousand twenty-four.

Present:

> ROBERT D. SACK,
> WILLIAM J. NARDINI,
> EUNICE C. LEE,
> *Circuit Judges*.

_____

UNITED STATES OF AMERICA,

> *Appellee*,

v.                                                                          23-6755-cr

JASON KURLAND, a/k/a Jay,

> *Defendant-Appellant*,

CHRISTOPHER CHIERCHIO, FRANGESCO RUSSO,
a/k/a Frankie, FRANCIS SMOOKLER,

> *Defendants*.

_____

| | |
|---|---|
| For Appellee: | Danielle Kudla, Olga I. Zverovich, Jacob R. Fiddelman, Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY. |
| For Defendant-Appellant Jason Kurland: | Arthur L. Aidala, David L. Lewis, Diana Fabi, Aidala Bertuna & Kamins, P.C. New York, NY. |

1

Appeal from a judgment of conviction of the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *District Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant-Appellant Jason Kurland appeals from a judgment of conviction entered on July 5, 2023, in the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *District Judge*) following a jury trial. A superseding indictment filed on May 17, 2022, charged Kurland with five counts: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud, in violation of 18 U.S.C. § 1343; (3) honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; (4) conspiracy to engage in unlawful monetary transactions, in violation of 18 U.S.C. § 1956(h); and (5) unlawful monetary transactions, in violation of 18 U.S.C. § 1957.[1] The government alleged that Kurland, an attorney who built a national practice representing lottery jackpot winners, participated in a criminal scheme to defraud several of his lottery-winner clients (the "Lottery Clients") of substantial portions of their winnings. In furtherance of that scheme, the government alleged, Kurland and his co-conspirators convinced the Lottery Clients to invest, based on material misstatements and omissions, in certain transactions and merchant cash advance ("MCA") businesses in which Kurland had undisclosed financial interests. The government also alleged that, on one occasion, Kurland personally took $19.5 million directly from a Lottery Client's bank account without the client's knowledge. Trial began on July 13, 2022, and ended on July 26, 2022, when the jury convicted Kurland on all five counts.

---

[1] The superseding indictment also charged Christopher Chierchio with wire fraud and unlawful monetary transactions.

On June 15, 2023, the district court sentenced Kurland principally to a term of 156 months in prison, to be followed by three years of supervised release, and ordered forfeiture of $64,600,000. On August 25, 2023, the district court entered an order of restitution in the amount of $73,453,826.

Kurland raises four principal arguments on appeal. First, he argues that the district court erred by denying his motion to suppress the contents of his cell phone, asserting that federal law enforcement agents seized the phone without a warrant in violation of the Fourth Amendment. Second, he argues that the district court abused its discretion by removing from the jury venire all people who were not vaccinated against COVID-19, in violation of his right to a jury drawn from a fair cross-section of the community. Third, he argues that the district court abused its discretion by excluding two emails he sent to people, who were not Lottery Clients, that purportedly showed that he had properly disclosed to them his financial interest in one of the MCA businesses. Fourth, he argues that the district court erred in determining the amount of the Lottery Clients' losses that were attributable to him under the United States Sentencing Guidelines. We assume the parties' familiarity with the case.

## I. Motion to Suppress

Prior to trial, Kurland moved to suppress the contents of his cell phone, which federal agents had seized when they arrested him at his home on August 18, 2020. In support of that motion, Kurland submitted an affidavit asserting the following facts. While the agents were speaking to Kurland, he asked his wife to call his attorney, so she took his cell phone—which was on the kitchen island about ten feet from Kurland—and called the attorney from a different room. After the call, Kurland's wife put the phone back on the kitchen island. Later, as the agents prepared to take Kurland to the FBI field office, Kurland asked an agent if he needed his phone, and the agent responded that he would need it if he wanted to call his wife or attorney. Kurland

3

then retrieved his phone from the kitchen island. When Kurland walked out of his home shortly thereafter, the agents placed him in handcuffs and took his phone. The agents temporarily returned the phone to Kurland at the field office so that he could try to call his attorney, but they took the phone back after the call failed to go through. The agents subsequently obtained a warrant to search the electronic contents of the phone.

Accepting the facts in Kurland's affidavit as true for purposes of the motion, the district court denied the motion, concluding that the agents had lawfully seized Kurland's phone pursuant to two exceptions to the Fourth Amendment's warrant requirement—the plain-view exception and the incident-to-arrest exception. On appeal, Kurland argues that the district court erred, asserting that neither exception applied. Kurland further argues that the agents acted in bad faith, making suppression appropriate under the exclusionary rule, and that the admission of the illegally obtained evidence at trial was not harmless error.

When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. O'Brien*, 926 F.3d 57, 72 (2d Cir. 2019). As set forth below, we agree with the district court that the federal agents lawfully seized Kurland's phone pursuant to the plain-view exception, and we therefore decline to address Kurland's other arguments.

The plain-view doctrine provides that "a law enforcement officer may seize evidence without a warrant if (1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." *United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017).[2]

---

[2] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

"Seizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence." *Id.* at 180. An officer has probable cause when, for example, the officer has "knowledge of the relationship between the evidence seized and the . . . conspiracy, gleaned through months of investigation." *United States v. Escobar*, 805 F.2d 68, 72 (2d Cir. 1986). Pursuant to the collective knowledge doctrine, the seizing officer need not have personal knowledge of the facts establishing probable cause so long as "other law enforcement officials initiating or involved with the investigation" had "sufficient information to justify" the seizure. *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

Kurland does not seriously contest the district court's conclusions that the agents were lawfully in a position from which they could see his phone on the kitchen island, or that they could lawfully access the phone, and we agree with the district court that those requirements were met. Kurland principally argues that "the incriminating character of the cell phone was not immediately apparent," rendering the plain-view exception inapplicable. Kurland Br. 22. This argument is foreclosed by *Babilionia*, in which we concluded that similar facts justified the warrantless seizure of a cell phone in plain view. There, as here, the arresting agency had been "investigating [the defendant] for months" at the time of the arrest; "[t]he investigation had revealed that the . . . conspiracies involved the use of multiple cell phones"; and "[a] separate wiretap investigation . . . showed that [the defendant] and his co-conspirators used cell phones to conduct [criminal] activity." *Babilonia*, 854 F.3d at 180. Kurland attempts to distinguish *Babilonia* on the ground that the arresting officer there had "actual knowledge" of the facts that established probable cause to seize the defendant's cell phones, whereas the record here contained "no evidence to suggest that the agents who arrested Kurland and seized his phone had knowledge" sufficient to justify the seizure. Kurland Br. 23–24. Under the collective knowledge doctrine, however, we impute to the

5

agents who arrested Kurland the knowledge held by their fellow law enforcement officers that Kurland and his co-conspirators used cell phones in furtherance of their criminal conduct. *See Colon*, 250 F.3d at 135. Accordingly, we conclude that the arresting agents lawfully seized Kurland's cell phone under the plain-view doctrine.

## II. Removal from the Jury Venire of Unvaccinated Prospective Jurors

Kurland next argues that the district court abused its discretion by removing all members of the jury venire who were not vaccinated against COVID-19, asserting that this decision deprived him of a jury drawn from a fair cross-section of his community, in violation of the Sixth Amendment and the Jury Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1861, *et seq*. On May 27, 2022, several weeks before trial, the district court issued a written order explaining why it would require the jury to be vaccinated, concluding that this policy was appropriate "to reduce the risk of COVID-19 transmission in the courtroom, to facilitate the administration of trials, and to help cure the backlog of trial-ready cases." App'x 73. During jury selection, only two of 105 prospective jurors—Juror 88 and Juror 91—reported that they were not vaccinated. The twelve principal jurors were selected from the first sixty-eight prospective jurors, while Jurors 70, 72, 80, 81, 102, and 105 were selected as alternates. Kurland contends that the district court's "removal of unvaccinated jurors operated as a proxy for racial exclusion," which "resulted in the under-representation of Blacks and Hispanics in the venire made available for Kurland's jury selection."[3] Kurland Br. 44, 47–48.

---

[3] In addition to his Sixth Amendment and JSSA claims, Kurland argues, only in passing, that the district court's decision to exclude unvaccinated jurors violated the Fifth Amendment's Equal Protection Clause, apparently based on the same theory of racial exclusion. "To succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that (1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, i.e., is the result of intentional discrimination by the District." *United States v. Rioux*, 97 F.3d 648, 659 (2d Cir. 1996). As set forth herein, Kurland's challenge to the district court's exclusion of unvaccinated jurors is not actually aimed at the jury selection *system* (but rather to for-cause dismissals of members of the assembled jury venire), and it therefore fails under the Fifth

Kurland's argument is not, in fact, a fair cross-section challenge. The fair cross-section requirement applies to a court's process for assembling the jury venire, not to the court's decisions to remove certain jurors for cause from the assembled venire. *See, e.g.*, *United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2000) (rejecting fair cross-section claim where appellant "made absolutely no showing that African Americans were systematically excluded" from the venire). The Supreme Court has "never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). Moreover, the JSSA expressly authorizes district courts to exclude prospective jurors for cause on the basis that their presence "would be likely to disrupt the proceedings . . . [or] adversely affect the integrity of jury deliberations." *United States v. Colon*, 64 F.4th 589, 596 n.7 (4th Cir. 2023) (quoting 28 U.S.C. §§ 1866(c)(2), (c)(5)). Consistent with these principles, the Supreme Court held in *Lockhart* that "any . . . group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case[] may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement." 476 U.S. at 176–77. Even if Kurland could bring a fair cross-section challenge to the composition of the petit jury, Kurland "concedes that the group of unvaccinated jurors, not being immutably distinctive, fails the first prong" of the fair cross-section test set forth in *Duren v. Missouri*, 439 U.S. 357 (1979).[4] Kurland Br. 48. Accordingly, Kurland's purported fair cross-section claim fails.

_____

Amendment for the same reasons that it fails under the Sixth Amendment and the JSSA. In any event, Kurland makes no argument that the district court intentionally discriminated against Black and Hispanic prospective jurors, so his Fifth Amendment claim necessarily fails for this reason alone.

[4] Under *Duren*, to establish a *prima facie* violation of the fair cross-section requirement, a defendant must

Even assuming that it would be error for a district court to remove unvaccinated individuals from a jury venire, any error here was plainly harmless. The two jurors (Jurors 88 and 91) who were excluded under the vaccination requirement would not have been seated on the jury proper in any event. The twelve principal jurors were selected from the first sixty-eight prospective jurors; at best, the unvaccinated jurors would have been alternates, and no jurors were excused during the trial. Accordingly, the exclusion of unvaccinated individuals from the jury venire, even if erroneous, had no impact on the outcome of the trial and therefore could not provide any basis for vacating Kurland's conviction. *See United States v. Feliciano*, 223 F.3d 102, 110–12 (2d Cir. 2000) (applying harmless error analysis to a jury selection challenge where the alleged error did not "fundamentally undermine the fairness or the validity of the trial").

## III. Exclusion of Proffered Defense Evidence

Kurland further argues that the district court abused its discretion by excluding, under Federal Rule of Evidence 403, two emails that purportedly showed that Kurland disclosed his interest in one of the MCA businesses to a client other than the Lottery Clients. In the proffered emails, Kurland sent an operating agreement for JBMML, one of the MCA businesses, to someone the defense asserted was one of Kurland's clients who ultimately invested in JBMML. The defense claimed that the operating agreement disclosed Kurland's ownership interest in JBMML. Thus, the defense argued, the emails would help to rebut the government's theory that Kurland concealed his ownership interest at the company. The district court excluded the emails on the ground that

establish:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364.

8

they would distract the jury and invite "a speculative process" because, among other things, the emails were not directed to "a lottery beneficiary."  Trial Tr. 1530–31.

The district court did not abuse its discretion by excluding Kurland's two proffered emails. Even assuming the emails showed that Kurland had disclosed his business interest to a single client in a context unrelated to this case, that fact would not bear on the question of whether he had made similar disclosures with respect to the Lottery Clients.  *See United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (a defendant may not introduce evidence of prior "good acts" because such "evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit"); *see generally United States v. Litvak*, 889 F.3d 56, 67 (2d Cir. 2018) (evidentiary rulings are reviewed for abuse of discretion, and will be disturbed only if "manifestly erroneous").

## IV. Loss Determination at Sentencing

Finally, Kurland argues that the district court erred in its calculation of loss under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  Under the Guidelines, a defendant's offense level is based in part on the amount of "loss" involved in the offense, and the applicable loss amount is "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1(b)(1). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense"—that is, "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.* § 2B1.1(b)(1)(C)(i), (iv).  At sentencing, the district court adopted the actual loss calculation set forth in the Presentence Report, which amounted to $62,006,109.  This figure comprised: (1) the Lottery Clients' net losses from investments in JBMML; (2) $626,000 in undisclosed kickbacks that Kurland received for the Lottery Clients' investments in another MCA business, Cheddar Capital; (3) $19.5 million that Kurland directly stole from a Lottery Client's bank account for a purported investment; and

9

(4) another Lottery Client's net loss from a $2.5 million investment in personal protective equipment during the COVID-19 pandemic, which Kurland fraudulently induced and then misappropriated. Although Kurland concedes that he is liable for the $626,000 in undisclosed kickbacks, he argues that the remaining losses were not reasonably foreseeable to him, asserting that he had a "good faith belief" that the Lottery Clients' investments "would be repaid." Kurland Br. 66. He contends that, excluding the kickbacks, the Lottery Clients' losses "result[ed] from the criminal activity of [his co-conspirators] . . . which was unbeknownst to [him]." *Id.*

We review the district court's application of the Guidelines *de novo* and its underlying factual determinations for clear error. *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). "A district court's factual findings at sentencing need be supported only by a preponderance of the evidence," *United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015), and may rest "on circumstantial evidence and on reasonable inferences drawn therefrom," *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004). A sentencing court is "only required to make a 'reasonable estimate of the loss.'" *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1 cmt. n.3(c)). "[B]ecause the sentencing court is in a unique position to assess the evidence and estimate the loss based upon that evidence," we afford its loss determination "appropriate deference." *Id.* at 720.

The district court did not clearly err in finding that the Lottery Victims suffered $62,006,109 in actual losses that were reasonably foreseeable to Kurland. The record contained ample evidence showing that Kurland understood that the investments in the MCA businesses were highly risky, and that he knew or should have known that the Lottery Clients' funds for purported PPE investments, including the $19.5 million that he stole from a Lottery Client's account, would be misappropriated. Because Kurland was aware of the Lottery Clients' exposure,

10

their actual losses were reasonably foreseeable to him notwithstanding that he did not have a direct role in every act that led to those losses. *See United States v. Cutler*, 520 F.3d 136, 160 (2d Cir. 2008) (where defendant was "[a]ware of the magnitude of [the victims'] exposure," he was responsible for loss even though he "may not have been involved in the everyday" acts by co-conspirators that caused the loss).

\* \* \*

We have considered Kurland's remaining arguments and find them to be unpersuasive. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk